The PEOPLE of the State of Colorado, Petitioner,

v.

Lawrence C. GARCIA, Respondent.

No. 91SC39.

Supreme Court of Colorado, En Banc.

March 10, 1992.

Rehearing Denied April 6, 1992.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Daniel J. Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Douglas J. Friednash, Sp. Asst. Atty. Gen., Denver, for petitioner.

David F. Vela, Colo. State Public Defender, Kathleen A. Lord, Deputy State Public Defender, Denver, for respondent.

Justice ERICKSON delivered the Opinion of the Court.

Defendant Lawrence C. Garcia was charged and convicted by a jury of second-degree murder [1] and crime of violence [2] for the stabbing death of L.C. The trial court imposed a sentence of twenty-four years and one day. The court of appeals reversed Garcia's conviction and remanded for a new trial for the failure of the trial court to instruct the jury on "heat of passion" manslaughter.[3] *People v. Garcia*, 809 P.2d 1038 (Colo.App.1990). The trial court was also given instructions by the court of appeals on conducting the new trial regarding: (1) hearsay evidence under the excited utterance exception of CRE 803(2), (2) closing argument by the prosecution, and (3) the absence of the trial judge

---

1. § 18–3–103, 8B C.R.S. (1986).

2. § 16–11–309, 8A C.R.S. (1986).

3. The statutory definition of "heat of passion" manslaughter is set forth in section 18–3–104(1)(c), 8B C.R.S. (1986), which provides, in relevant part, that a person is guilty of manslaughter if

> [h]e knowingly causes the death of another person under circumstances where the act causing the death was performed upon a sudden *heat of passion,* caused by a serious and highly provoking act of the intended victim, affecting the person killing sufficiently to excite an irresistible passion in a reasonable person; but, if between the provocation and the killing there is an interval sufficient for the voice of reason and humanity to be heard, the killing is murder.

(Emphasis added.)

during the introduction of videotaped evidence. Based upon our review of the record, we conclude that the failure to give a heat of passion manslaughter instruction was not error. We hold that none of the asserted errors, which were the subject of the advisory instructions given by the court of appeals, constitutes reversible error. Accordingly, we reverse the court of appeals and return this case to the court of appeals with directions to reinstate the judgment of conviction and sentence imposed on Garcia by the district court.

## I

Garcia lived in a two-story apartment with L.C., who was four months pregnant with his child, and with L.C.'s two-year-old son. The kitchen and living room were located on the first floor. The second floor had two bedrooms and a bathroom. The front bedroom in the apartment was occupied by L.C., her son, and Garcia. During the early morning hours on July 2, 1987, the rear bedroom was occupied by L.C.'s sister and her two children, and by L.C.'s cousin and her child. At approximately 1:30 a.m., L.C.'s cousin heard the muffled sounds of an argument between Garcia and L.C. coming from the front bedroom and heard L.C. scream. L.C.'s sister heard loud voices coming from downstairs, but was unsure whether one of the voices belonged to Garcia, and also heard L.C. scream.

Shortly after 1:30 a.m., L.C., after an argument with Garcia, suffered a single stab wound to the chest with a kitchen knife. The stabbing occurred on the first floor of the apartment. The serrated kitchen knife that inflicted the wound was found in the living room on the back of the sofa near a pool of blood. After the stabbing, L.C. was able to climb the stairs and enter the back bedroom. When she appeared on the second floor, she was bleeding profusely and her son held on to her leg. Her only statement before she lost consciousness was, "He stabbed me."

4. Evidence established that L.C.'s son called Garcia "daddy" even though Garcia was not his

L.C. was dead on arrival at the hospital from loss of blood and suffocation. When the police concluded their investigation, Garcia was taken to the police station for questioning.

### Garcia's First Statement

At 7:05 a.m., Garcia gave a statement which the investigating officers recorded on videotape. He told the officers that after he made love to L.C., she went downstairs to the kitchen to get a glass of ice water. Garcia said that when he heard L.C. scream, he put on his shorts and went to the landing. He said he saw L.C. being held from behind by an Hispanic male with shoulder-length bushy and curly black hair, who was wearing blue jeans but no shirt. He yelled, "Who is that?" L.C. cried, "Don't come down here, babe!" Garcia then went into L.C.'s bedroom to get his baseball bat. As he returned to the landing, L.C. came up the stairs, holding her hands over a bleeding wound, and said, "He stabbed me."

Two days after L.C.'s death, her father and his wife took L.C.'s two-year-old son with them when they went to the funeral home to view L.C.'s body. Upon seeing his mother in the casket, the child started crying. When they left the funeral home, the son said to his grandfather, "Daddy did it." [4] One week after L.C.'s death, the child saw a photograph of his mother on the wall of his grandfather's house and said to his grandfather, "mama crying, mama and daddy fighting, mama bleeding."

### Garcia's Second Statement

On July 9, Garcia went to the police station and the investigating officers confronted him with inconsistencies in his earlier statement and with L.C.'s son's statement that, "Daddy did it." Garcia became visibly upset and admitted he had stabbed L.C. He made a second videotaped statement in which he related a substantially different version of the events that took

biological father.

place on the night of L.C.'s stabbing. Garcia said that at approximately 11:35 p.m. he came home upset after playing baseball. Although family members and friends were visiting L.C., Garcia went upstairs, took a bath, and laid down in L.C.'s bedroom. L.C. came upstairs and asked him what was wrong. Garcia told her he was upset because he did not get to start the game. They talked for a while and then had sexual intercourse. Afterwards, L.C. told Garcia she had heard that he was still having sex with his former girlfriend. Garcia told L.C. he loved only her, but she insisted that he was being unfaithful. Garcia became distraught and exclaimed, "Babe, if you don't believe me, nobody believes me, it ain't worth livin'." He went downstairs to the kitchen and was followed by L.C. Garcia grabbed a knife and as he raised the knife above his head to stab himself in the chest, L.C. ran towards him crying, "Larry, no!" She grabbed his arm, but Garcia could not stop the knife and L.C. was stabbed in the chest.

When the investigating officers asked Garcia why he had given a different statement on the morning after the stabbing, he told them, "I was scared." He said that there had never been an intruder and that he had come up with the story after hearing a neighbor talk about seeing a curly-haired stranger wearing jeans but no shirt behind the apartment.

At trial, Garcia's theory of defense was that an intruder stabbed L.C. Garcia testified that the statement he made in the first videotaped interview was the truth and that the second statement was given while he was upset and depressed and was a lie. He claimed the second story was a product of "anything that popped into my head." In closing argument, defense counsel endeavored to convince the jury that the first statement was true and that the second statement was the product of Garcia's depression.

## II

The court of appeals held that a heat of passion manslaughter instruction was re-quired because there was "evidence from which the jury could have found that the defendant stabbed L.C. during an argument after she had falsely accused him of involvement with another woman sufficient to raise an irresistible passion in a reasonable person." *People v. Garcia*, 809 P.2d 1038, 1040 (Colo.App.1990). We disagree and reverse the court of appeals holding that Garcia was entitled to a heat of passion manslaughter instruction.

 As a general rule, any credible evidence, no matter how "improbable, unreasonable or slight," which tends to reduce a homicide to manslaughter entitles a criminal defendant to a jury instruction on the lesser included offense. *People v. Shaw*, 646 P.2d 375, 380 (Colo.1982) (quoting *Read v. People*, 119 Colo. 506, 509, 205 P.2d 233, 235 (1949)); *see also People v. Fuller*, 781 P.2d 647, 651 (Colo.1990). We have noted that heat of passion manslaughter is technically not a lesser included offense of first- or second-degree murder. *People v. Lewis*, 676 P.2d 682, 688 (Colo. 1984). Nevertheless, we have recognized that a defendant only needs to show some supporting evidence to be entitled to a heat of passion instruction. *See Coston v. People*, 633 P.2d 470, 472 (Colo.1981). The necessary supporting evidence, however, must establish four elements:

(1) [T]he act causing the death was performed upon a "sudden heat of passion," (2) caused by a "serious and highly provoking act of the intended victim," (3) which was sufficient "to excite an irresistible passion in a reasonable person," and (4) between the provocation and the killing, an insufficient "interval" of time passed for "the voice of reason and humanity to be heard."

*Id.*

 Garcia's second videotaped interview, in which he stated that L.C. repeatedly accused him of sexual infidelity during an argument prior to the stabbing, provides the only evidence in the record which might support a heat of passion manslaughter

instruction.[5] Garcia's testimony that the second videotaped interview was a fabrication and a lie is a binding judicial admission. In *Kempter v. Hurd*, 713 P.2d 1274, 1279 (Colo.1986), we defined judicial admission as

> a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute. *Judicial admissions are conclusive on the party making them* and generally continue to have effect for a subsequent part of the same proceeding.

(Citations omitted and emphasis added.) The New Hampshire Supreme Court, in addressing a judicial admission, said:

> [W]hen a party testifies to facts in regard to which he has special knowledge, such as his own motives, purposes, or knowledge or his reasons for acting as he did, the possibility that he may be honestly mistaken disappears. His testimony must be either true or deliberately false. To allow him to contradict his own testimony under these circumstances would not be "consistent with honesty and good faith." Whether his statements be true or false, he will be bound by them, and possible contradictions by other witnesses become immaterial. He will not be allowed to obtain a judgment based on a finding that he has perjured himself.

*Harlow v. Laclair*, 82 N.H. 506, 136 A. 128, 130 (1927). *See also, Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895) ("It may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position. . . ."); *Ohio & Miss. Ry. v. McCarthy*, 96 U.S. 258, 267–68, 24 L.Ed. 693 (1877) ("Where a party gives a reason for his conduct, and decision touching anything involved in a controversy, he cannot, after the litigation has begun, change his

ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold."). Garcia cannot rely on a statement that he has, under oath, declared to be false in order to obtain a heat of passion manslaughter instruction.

In *Sterling v. People*, 151 Colo. 127, 131, 376 P.2d 676, 678 (1962), in considering a defendant's entitlement to a theory of the case instruction, we said:

> While we have repeatedly held that a defendant in a criminal proceeding is entitled to an instruction based on his "theory of the case," this does not mean that just any instruction so labeled should be given by the trial court. Such an instruction must be in proper form and based on the evidence in the record, and should not merely reflect the wishful thinking of counsel. We disapprove of course of an instruction on a theory of the case which is totally unsupported by evidence, and also we equally condemn an instruction which emphasizes the evidence deemed helpful to a defendant, but conveniently overlooks undisputed evidence of an incriminating nature.

Here, there was no evidence apart from the videotaped statement to support a heat of passion manslaughter instruction. Manslaughter was not even Garcia's theory of defense. *See United States v. Horton*, 921 F.2d 540, 544 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991). In *Spuehler v. State*, 709 P.2d 202 (Okla.Crim.App.1985), the defendant testified that he did not kill the victim and asserted that another person was responsible. The trial court refused to instruct the jury on heat of passion and misdemeanor manslaughter and the appellate court affirmed, holding that "[w]hen a defendant, who has a right of election as to several defenses, takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one." *Id.* at 204. Garcia cannot claim that an intruder stabbed L.C. and at the

---

5. We are not required to determine the sufficiency of the evidence to support Garcia's claim that a heat of passion manslaughter instruction should have been given.

same time obtain an instruction based on the theory that he stabbed L.C. in the heat of passion.

### III

The trial court found L.C.'s son was incompetent to testify. However, two of the son's statements to his grandfather were admitted as excited utterances. CRE 803(2). *Cf. White v. Illinois,* — U.S. —, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (confrontation clause does not require prosecution to demonstrate that a child in a sex abuse case is unavailable in order to use the child's out-of-court statements). The first statement, "Daddy did it," was made when L.C.'s son, after he saw his mother in a casket, was leaving the funeral home with his grandfather. The second statement, "Mama crying, mama and daddy fighting, mama bleeding," was made after the boy saw his mother's photograph on the wall at the grandfather's home approximately one week after the stabbing.

L.C.'s father testified that his grandchild was "overattached" to L.C. and that he was always with her. He said he would not have been surprised if the child was downstairs at the time L.C. was stabbed. L.C.'s cousin testified that she heard Garcia and L.C. arguing in the front bedroom and that she heard L.C. scream. L.C.'s sister thought she heard L.C. scream from the downstairs area. L.C.'s two-year-old son was with L.C. and was hanging on her leg when she lost consciousness from the stab wound.

The court of appeals held that the admission of the statements by the trial court was error because the evidence was not sufficient to establish that L.C.'s son witnessed the stabbing. The court of appeals directed the trial court not to admit the hearsay statements on retrial. We find no reversible error in the admission of the hearsay statements.

■ Before a court may admit a hearsay statement under the excited utterance exception, there must be enough direct or circumstantial evidence to allow the jury to infer that the declarant had an opportunity to observe the event that is the subject of the declarant's statement. *People v. Dement,* 661 P.2d 675, 678–79 (Colo.1983); CRE 602. The burden of establishing the preliminary facts to establish the hearsay exception is on the proponent of the evidence. *Lancaster v. People,* 200 Colo. 448, 453 n. 2, 615 P.2d 720, 723 n. 2 (1980). In reviewing the trial court's decision on the admissibility of the two statements under the excited utterance exception, we must consider the totality of circumstances presented to determine whether the trial court abused its discretion. *See People v. Franklin,* 683 P.2d 775, 782 (Colo.1984).

■ The totality of circumstances show: (1) that L.C.'s son, often clung to his mother and slept in the room with L.C. and Garcia; (2) that an argument was heard coming from L.C.'s room; and (3) that shortly after L.C. was stabbed, her son was seen holding onto her leg.

The issue is whether the prosecution's foundation for the admission of L.C.'s son's statements to his grandfather was adequate to permit the admission of the hearsay evidence as an excited utterance. *See* CRE 803(2). We believe the foundation was minimally sufficient to permit the trial judge, within his sound discretion, to admit the statements for consideration by the jury under proper instructions.

A declarant's statement may not be admitted unless there is sufficient evidence "to support a finding that he has personal knowledge of the matter." *See* CRE 602. "The threshold for satisfying the personal knowledge requirement is not very high and may be inferable from sources other than the witness...." *Burlington N. R.R. Co. v. Hood,* 802 P.2d 458, 469 (Colo. 1990).

> Thus, as long as there is evidence before the trial court that the jury, as the trier of fact, could reasonably find that the witness has personal knowledge of the event to which the witness is about to testify, the witness should be permitted to testify, and the questions of credibility and weight should be left for the jury to resolve.

*Id.*

The substance of both statements provides some support for a finding that L.C.'s

son saw the stabbing. *See Dement*, 661 P.2d at 679. In addition, the son was in close proximity to his mother both before and immediately after she was stabbed and was present during at least part of the argument between L.C. and Garcia. L.C.'s son was two years old at the time the stabbing occurred. The rationale behind the admittance of an excited utterance is that statements made under the stress of excitement are generally reliable when made by a child who lacks the capacity to fabricate. *People ex rel. O.E.P.*, 654 P.2d 312, 318 (Colo.1982). The first statement was made just after L.C.'s son saw his mother in a casket. The second statement, made not long thereafter, was made when he was living in grandfather's home after his mother's death and when he saw his mother's picture. Both events could be shocking to a two-year old, and neither statement was prompted or made in response to a question from his grandfather.

The foundation laid by the prosecution for the admission of the excited utterance evidence may not have been perfect, but it was adequate, although far from perfect, when viewed in the totality of the circumstances for submission to the jury under proper instructions.

Accordingly, the trial court did not abuse its discretion in admitting the two-year-old son's hearsay statements for consideration by the jury as an excited utterance.

### IV

During closing argument, the prosecutor, using a metaphor about a stable of horses that have minds of their own, pointed out the inconsistency between Garcia's intruder theory and the trial court's manslaughter instruction:

So while defense counsel stands before you and tries to get that horse called intruder home to you, I want you to think about a few things. If the issue is identity, then why have you been instructed on lesser included offenses?

The court of appeals held that the prosecution's statement was misleading. We do not agree. Here, the prosecution's argument called for a reasonable inference based upon the comparison of the evidence supporting Garcia's theory of defense and an inconsistent instruction, and was proper argument. *See* Standards for Criminal Justice Standard 3–5.8 (2d ed. 1986).

### V

During trial, the prosecution sought to have the jury view Garcia's two video-taped statements to the police. The trial judge approved the admission of the video-taped evidence, then informed the jury that he had already viewed the videotapes [6] and left the courtroom with the court reporter.

The playing of the tapes began late in the day and, pursuant to the trial judge's instruction, was not completed until the following morning, at which time the trial judge once again excused himself from the courtroom. The court of appeals noted its disapproval of the trial judge's absence and held that a judge must be present in the courtroom while evidence is being introduced. The prosecution maintains that, since Garcia did not object to the trial judge's absence or the procedure followed, there was no reversible error. We agree.

The importance of the presence of a trial judge at a jury trial is axiomatic. In *O'Brien v. People* we stated:

Under our judicial system every criminal trial must take place in open court. It must be conducted in the presence of the judge as well as of the jury. The judge must be present to superintend the proceedings, uphold the majesty of the law, and thus give protection and security to all parties interested or concerned in the result of the trial. The arguments of counsel, as well as the taking of the evidence are a part of the trial; and the judge cannot properly absent himself while such proceedings are being carried on; it is his duty to be present and see to

**6.** The evidence is inconclusive as to whether the trial court viewed the tapes at any time between the suppression hearing and the admission of the tapes into evidence. Garcia contends that

the trial court never reviewed the videotapes, but no objection was made to the trial judge leaving the courtroom.

it that counsel in their arguments do not travel outside the record, nor transcend the limits of legitimate discussion. Moreover, the presence of the judge is essential to the organization of a court for the trial of felony cases. If the judge is absent while substantial proceedings, such as the taking of evidence or the argument of counsel, are being carried on in the presence of the trial jury, such proceedings must be regarded as *coram non judice* ; [7] and if, as in this case, it affirmatively appears by the bill of exceptions that the judge was absent against the objections of the defendant, his absence must be held ground for reversal.

17 Colo. 561, 562–63, 31 P. 230, 230–31 (1892).[8] If the trial judge viewed the videotapes with counsel present and left the courtroom with the consent of counsel when the videotapes were shown to the jury, the error would be harmless.

The videotaped evidence at issue was crucial to both the prosecution and the defense. The prosecution suggests that, in the modern world, defense counsel may hit the pause button on the videotape recorder, make objection to the trial judge in the next room, and then the court may review the objectionable part of the taped testimony before proceeding. We need not consider the procedure recommended by the prosecution. When the tape was played for the jury, no objection was made to the trial judge leaving the courtroom, and no objections were made during the time that the jury viewed the playing of the tape.

Accordingly, we hold that the absence of the trial judge during the introduction of the videotaped evidence was not reversible error. *See Arizona v. Fulminante,* ——

**7.** "In presence of a person not a judge. When a suit is brought and determined in a court which has no jurisdiction in the matter, then it is said to be *coram non judice,* and the judgment is void." Black's Law Dictionary 305 (5th ed. 1979).

**8.** We did not find reversible error, however, in a case in which the judge retired to a room next to the courtroom where he could hear every word spoken by the attorneys and in which the defense made no objection. *See Rowe v. People,*

U.S. ——, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991).

## VI

We reverse and remand to the court of appeals with directions to reinstate the judgment of conviction and sentence imposed on Garcia by the district court.

26 Colo. 542, 546, 59 P. 57, 59 (1899). The rule in *Rowe* was modified to provide that a judge may only justify leaving the courtroom if he remains within hearing and sight of counsel and the jury and is able to "instantly ... interpose his authority in preserving decorum in the courtroom and to pass upon questions as they arise, and assert and maintain that full control over the trial which is so essential a part of due process of law." *Graves v. People,* 32 Colo. 127, 134, 75 P. 412, 414 (1904).