JUDGE TAUBMAN, concurring in part and dissenting in part.
¶ 77 This case illustrates what happens when a decedent tries, and fails, to avoid probate by passing her property in joint tenancy to two of her three heirs. It is an exercise in asset transfers gone awry. Because I disagree with the majority that the Citizens Bank estate account established by Vicki J. Sandstead (Sandstead), the original personal representative (PR) of the estate and one of the daughters of decedent Auriel Sandstead (Auriel), was not estate property and that the original Citizens Bank accounts did not fit within an exception to the multi-party accounts statute, I respectfully dissent in part.
¶ 78 As discussed below, I conclude that the district court properly exercised probate jurisdiction over the funds in the Citizens Bank estate account based on Sandstead's repeated representations for over two years that those funds were part of Auriel's estate. I also conclude that the multi-party account statutes do not apply here and, thus, did not divest the district court of probate jurisdiction. I would affirm the district court's orders imposing surcharges and attorney fees against Sandstead to the extent they relate to the Citizens Bank accounts and the Citizen Bank estate account. I concur with the majority's affirmation of the order enforcing an in terrorem clause.
¶ 79 I conclude the district court properly surcharged Sandstead for transactions related to the Citizens Bank estate account because it had jurisdiction as a result of Sandstead's judicial admissions that the Citizens Bank estate account was estate property. I also conclude that the district court properly surcharged Sandstead for transactions occurring before she was appointed PR because she acted in a fiduciary capacity for her sister, Shauna Sandstead Corona (Corona), when those transactions occurred and, thus, the original Citizens Bank accounts were fiduciary accounts subject to an exception in the multi-party account statute.
I. Background
¶ 80 As the majority notes, Auriel took steps to simplify her affairs so that Sandstead and Corona could divide the bulk of her property equally without it passing through probate. To avoid probate of the family farm, Auriel sold the property and put the proceeds into multi-party accounts at a Wells Fargo bank in Sterling, Colorado, with Auriel, Sandstead, and Corona listed as joint owners. At the time of the sale, the farm's title was in a living trust and its beneficiaries included Auriel, Sandstead, and Corona. In June 2007, following the sale of the farm, Sandstead transferred about $200,000 from the Wells Fargo accounts to Citizens Bank accounts in Boston in the names of Auriel and Sandstead.
¶ 81 Following their mother's death in November 2007, the two sisters, upon advice of an attorney that it was unnecessary to open an estate proceeding, carried out all transactions relating to the distribution of the estate informally and by agreement. However, Corona and Sandstead began to disagree on the management and division of their mother's property.
¶ 82 In early June 2009, two years after she established the Citizens Bank accounts, Sandstead opened an estate account at Citizens Bank and transferred about $180,000 from the other Citizens Bank accounts into the estate account.[1] Later that month, Sandstead *813 opened an informal probate case in Colorado and was also appointed PR to probate Auriel's will dated January 10, 1991. In May 2010, Sandstead filed an estate inventory, in response to Corona's motion, and listed the Citizens Bank estate account as estate property.
¶ 83 Less than a year later, the relationship between Sandstead and Corona further deteriorated. In May 2010, Corona filed a petition to remove Sandstead as PR. On June 10, 2010, Sandstead resigned as PR, and she and Corona agreed to the appointment of a successor PR. In July 2010, Sandstead filed her first accounting in the estate proceeding, which included receipts from transactions related to the original Citizens Bank accounts as well as the Citizens Bank estate account, and other estate-related receipts. In August 2010, a new attorney entered his appearance on behalf of Sandstead.
¶ 84 In February 2011, Corona filed a motion for surcharge, attorney fees, and other relief against Sandstead for her alleged maladministration of the estate as PR. Later that month, Sandstead filed a second accounting in the estate proceeding and again included receipts from transactions related to the original Citizens Bank accounts and the Citizens Bank estate account. On February 14, 2011, in her response to Corona's motion for an accounting, Sandstead stated, "on the date of death, the only property owned by the decedent subject to the probate laws of the state of Colorado was her personal property in her house, two cars, and three bank accounts at the Citizens Bank in Boston, Massachusetts." In April 2011, Sandstead filed an amended estate inventory, which again listed the Citizens Bank estate account as estate property.[2]
¶ 85 In early July 2011, Sandstead suggested in her trial brief that the funds in the original Citizens Bank accounts were not property of Auriel's estate because the accounts were jointly owned by Auriel and Sandstead and passed to Sandstead on Auriel's death; however, Sandstead did not mention that she had established an estate account at Citizens Bank two years earlier.
¶ 86 A few days later, Sandstead filed a motion in limine to prohibit Corona from introducing evidence at trial regarding the Citizens Bank accounts, which the court granted. Sandstead's motion in limine asserted:
1. On page 1 of [Corona's] Trial Brief, [Corona] describes a transfer of $200,000 from a bank account in Colorado that was owned jointly by [Auriel], [Sandstead], and [Corona] to accounts in Massachusetts that were owned by [Auriel] and [Sandstead] only. She states that this occurred five months prior to [Auriel's] death on June 20, 2007.
....
3. On page 5, [Corona] references a[n] August 2, 2007, transfer involving $10,000 and a November 19, 2007, transfer involving $20,000, both transfers occurring before [Auriel's] death, making them non-estate property. Moreover, [Corona] admits that these monies came from an account over which [Sandstead] was a signatory and named owner.
....
WHEREFORE, [Sandstead] requests that this Court enter an Order, in limine, before the start of the trial on July 18, 2011, prohibiting [Corona] from introducing evidence regarding the transfers of money *814 out of bank accounts before [Auriel's] death.
¶ 87 In my view, Sandstead indicated at most, that the $30,000 of the funds in the Citizens Bank account described above were not part of the estate.
¶ 88 Despite granting the motion in limine, the court allowed Corona's attorney at the July 2011 trial to question Sandstead about transactions and money transfers occurring before Auriel's death. Sandstead testified that she was using funds from the Citizens Bank accounts and estate account, after Auriel's death and both before and after her appointment as PR, for estate purposes. Because Sandstead failed to mention that she was Auriel's attorney-in-fact prior to the establishment of the accounts in question, the court determined that the factual underpinnings of its order granting the motion in limine were incomplete.
¶ 89 In its first written post-hearing order on the motion for surcharge, the court found, notwithstanding its prior rulings, that Sandstead was a fiduciary as to the money in the Citizens Bank accounts because Sandstead had acted under an agency created by the March 2007 durable power of attorney in transferring the money from Wells Fargo to Citizens Bank, and had established an implied or constructive trust, the assets of which were later administered in the estate under Sandstead's authority as PR.
¶ 90 In February 2012, Sandstead argued in her motion for reconsideration or for a new trial that the Citizens Bank estate account was not estate property.
¶ 91 In five detailed orders, the court surcharged Sandstead for improper use of estate property including: expenses to which Corona objected and which Sandstead paid out of the estate funds anyway; Sandstead's unsubstantiated payments to herself; missing funds or unexplained discrepancies and transfers; waste and unreasonable moving and storage costs; an appraisal for a quilt Sandstead improperly donated; and attorney fees and costs. For example, the court surcharged Sandstead $2414.57 for expenses related to Sandstead's travels to a condominium owned by both sisters in Florida. The court found that "[n]o benefit to the Estate or Trust ha[d] been shown ... and [the expenses] post-date Ms. Corona's objection to further work on the condo." The court also surcharged Sandstead $10,250 for donating nineteen valuable, heirloom quilts. The court found that Sandstead as PR "lacked the power to make gifts of valuable trust assets" and, in fact, was obligated to distribute any tangible assets in the trust corpus pursuant to a memorandum prepared by Auriel, which Sandstead never produced.
¶ 92 In these five orders, the court surcharged Sandstead over $100,000 for improper spending of funds in the Citizens Bank accounts both before and after Auriel's death. The court ordered one surcharge of $25,000 for actions Sandstead took before Auriel's death. The court imposed eight surcharges against Sandstead for actions she took after Auriel's death, but before her appointment as PR, in the amount of $36,716.15. The court imposed an additional eleven surcharges against Sandstead for actions she took while she was PR in the amount of $16,325.15. The court imposed four more surcharges against Sandstead for actions she took after she was removed as PR in the amount of $50,821.27.
¶ 93 In March 2013, the court admitted Auriel's will dated July 25, 2000, to probate in formal proceedings. The court also vacated its previous order for informal probate of Auriel's will dated January 10, 1991. The court, in a detailed analysis, agreed with Sandstead that Willard (Auriel's late husband) and Auriel had not effectively revoked the living trust, but found the proceeds from the farm sale had been handled as "estate assets" and were therefore subject to the court's jurisdiction. The court also found that Auriel's 2000 will was valid.
II. Subject Matter Jurisdiction
¶ 94 I perceive no error in the district court's conclusion that it had jurisdiction over the Citizens Bank accounts and jurisdiction over Sandstead's expenditures of funds from those accounts before she was appointed PR.
A. Standard of Review
¶ 95 We review de novo a court's determination of jurisdiction.
*815 First Horizon Merch. Servs., Inc. v. Wellspring Capital Mgmt., LLC, 166 P.3d 166, 172 (Colo.App.2007).
B. Applicable Law
¶ 96 A district court sitting in a probate matter has the same jurisdiction as the Denver Probate Court. In re Estate of Lembech, 622 P.2d 606 (Colo.App.1980). Probate courts have broad jurisdiction, including jurisdiction over property claimed by the estate which may ultimately not belong to the estate. See In re Estate of Murphy , 195 P.3d 1147, 1151 (Colo.App.2008). Since a district court sitting in probate has the same jurisdiction as the Denver Probate Court, the district court here had jurisdiction "to determine every legal and equitable question arising in connection with decedents' ... estates, so far as the question concerns any person who is before the court by reason of any asserted right in any of the property of the estate...." Id. at 1150 (quoting § 13-9-103(3)(a), C.R.S.2015 ).
¶ 97 Section 15-10-302(1), C.R.S.2015, gives probate courts jurisdiction over all subject matter vested by "articles 1 to 10 of title 13" of the Colorado Revised Statutes, which includes article 9 of title 13 concerning the jurisdiction of the Denver Probate Court. Under section 15-10-302(2), a probate court has "full power to make orders, judgments, and decrees and take all other action necessary and proper to administer justice in the matters which come before it." Article 9 of title 13 specifically provides probate courts with jurisdiction "to determine every legal and equitable question arising ... so far as the question concerns any person who is before the court by reason of any asserted right in any of the property of the estate or by reason of any asserted obligation to the estate." § 13-9-103(3) (emphasis added).
¶ 98 Here, Corona filed her motion for surcharges under section 15-10-504(2)(a), C.R.S.2015, which provides that "[i]f a court, after a hearing, determines that a breach of fiduciary duty has occurred, or an exercise of power by a fiduciary has been improper, the court may surcharge the fiduciary [.]" While part 5 of article 10, title 15, does not specifically define "fiduciary," the provisions apply broadly to a variety of fiduciaries "over whom a court has obtained jurisdiction, including but not limited to a personal representative, special administrator, guardian, conservator, special conservator, trustee, agent under a power of attorney, and custodian...." § 15-10-501(3), C.R.S.2015.
¶ 99 Under section 15-10-501(2)(c), jurisdiction extends to "personal jurisdiction obtained by a court over a fiduciary as a result of the filing of a proceeding concerning the estate." The "estate," in turn, "means the estate of a decedent; a guardianship; a protective proceeding; a trust, including an implied trust; [or] an agency created by a power of attorney [.]" § 15-10-501(2)(b). Section 15-10-501(1) provides for probate jurisdiction over the fiduciaries of "nonsupervised trusts, private trusts, [and] agencies created by powers of attorney, ... except as provided in paragraph (c) of subsection (2) of this section[.]"
C. Analysis
¶ 100 I conclude that the district court had jurisdiction over the Citizens Bank estate account because the account became estate property when Sandstead repeatedly asserted (between June 2009 and July 2011) that the funds were estate property.[3] Estate of Murphy supports the conclusion that the district court had jurisdiction because the parties asserted competing interests over property that had initially been held with the decedent in joint tenancy in the Wells Fargo accounts. 195 P.3d at 1151. Therefore, the district court, sitting as a probate court, had jurisdiction to address both legal and equitable issues concerning the funds in the Citizens Bank estate account, including whether the proceeds from the farm sale were Sandstead's individual property or property of the estate.
¶ 101 The district court also correctly concluded it had jurisdiction to address allegations of misfeasance by Sandstead for the period leading up to, and during, her administration of the estate, because Sandstead acted under a fiduciary relationship created by the durable power of attorney and an implied trust.[4]
*816 ¶ 102 The district court concluded subsections (1) and (2)(c) of section 15-10-501 appear to be inconsistent because it seemed contradictory that a court could exercise personal jurisdiction under subsection 2(c) over a fiduciary as a result of a proceeding concerning an "estate" when jurisdiction over fiduciaries of certain trust and agencies created by powers of attorney appear to be denied under subsection (1).
¶ 103 Unlike the district court, I do not conclude that subsections (1) and (2)(c) of section 15-10-501 appear to be inconsistent. However, the court's observations explain how the two subsections relate to one another. Non-supervised trusts, private trusts, and power of attorney agencies generally need not be subject to court jurisdiction, while decedents' estates, guardianships, and conservatorships will generally be subject to judicial supervision. On the other hand, a court's jurisdiction over trusts, or power of attorney agencies and other entities, is not exercised until some action is needed to address the acts of a fiduciary, or for other reasons, such as to appoint a trustee. Once a proceeding has been initiated under subsection (2)(c), and personal jurisdiction is obtained over the fiduciary of an estate, the exception to the jurisdictional limitations described in subsection (1) applies, and the court may then "employ all of the powers and authority expressed in the provisions of this part 5 to maintain the degree of supervision necessary to ensure the timely and proper administration of estates by [the fiduciary in question.]" § 15-10-501(1).
¶ 104 As to trusts, specifically, the court has jurisdiction to oversee (1) trustees' compensation, section 15-16-205, C.R.S.2015; (2) whether their acts as trustee are in accord with their general obligations under section 15-16-302, C.R.S.2015; and (3) their duty to account, section 15-16-303, C.R.S.2015. See Restatement (Third) of Trusts §§ 82, 83 (Am. Law Inst.2007).
III. Judicial Admissions
¶ 105 I perceive no error in the district court's conclusion that Sandstead's repeated assertions over two years that the funds in the Citizens Bank estate account were part of Auriel's estate constituted judicial admissions that the Citizens Bank estate account was estate property.[5]
A. Standard of Review
¶ 106 We review de novo the legal conclusions of a district court. E-470 Pub. Highway Auth. v. 455 Co. , 3 P.3d 18, 22-23 (Colo.2000).
B. Applicable Law
¶ 107 A judicial admission is:
a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute. Judicial admissions are conclusive on the party making them and generally continue to have effect for a subsequent part of the same proceeding.
People v. Garcia , 826 P.2d 1259, 1263 (Colo.1992). The Garcia court, quoting the New Hampshire Supreme Court, stated that "[w]hether [a litigant's] statements be true or false, he will be bound by them, and possible contradictions by other witnesses become immaterial. He will not be allowed to obtain a judgment based on a finding that he has perjured himself." Id. (citation omitted); see also Davis v. Wakelee , 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895) (holding that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position"); but cf. Stelco Holding Co. v. United States , 44 Fed.Cl. 703, 711 (1999) ("[I]t is clear that prior to entry of *817 final judgment, the court has a duty to reject a judicial admission that is demonstrably false.").
C. Analysis
¶ 108 In my view, Sandstead's representations to the court over two years that she had established an estate account, the estate inventories and accountings, her trial briefs, and her trial testimony constituted judicial admissions that the funds in the Citizens Bank estate account were estate property.
¶ 109 First, in June 2009, Sandstead transferred the funds from the original Citizens Bank accounts into the estate account at Citizens Bank. Sandstead, in both her initial and amended estate inventories (May 2010 and April 2011) listed the Citizens Bank estate account as estate property, with no indication that she claimed it as individual property.[6] She also listed expenditures from the Citizens Bank estate account allegedly on behalf of the estate in both of her accountings in July 2010 and July 2011.
¶ 110 In July 2011, for the first time after two years of litigation, Sandstead changed her position, claiming that the $30,000 of funds in the Citizens Bank estate account transferred before Auriel's death were non-estate property. The record reveals no indication during the two previous years of litigation that Sandstead had previously made this assertion.
¶ 111 This declaration did not overcome Sandstead's repeated assertions in the district court that the funds in the Citizens Bank accounts were estate property, particularly when juxtaposed against Sandstead's own testimony at trial that she had used the Citizens Bank estate account for estate-related expenses. See Garcia, 826 P.2d at 1263. At the July 2011 trial, one week after Sandstead filed her motion in limine, she testified that she used money from the Citizens Bank estate account to pay for the estate attorney, furniture movers, auctioneers, and her own professional services to inventory the property in her mother's home. She also paid the auto insurance for her parents' cars and the electric bill for Auriel's home from the account. Thus, on the date Sandstead created the estate account at the Citizens Bank, funds in that account were subject to the probate laws of the state of Colorado.
¶ 112 Further, it was not until February 2012, after two years and eight months of litigation, that Sandstead unequivocally changed her position. Sandstead contended that after she put the funds in the estate account, she "claimed an undivided half interest in th[e] funds." However, the record reveals no indication during the almost three years of litigation that Sandstead had previously made this assertion. Again, this declaration, which only occurred after the district court had relied on her affirmative act of opening the estate account and subsequent failure to claim the account as her individual property to rule that the Citizens Bank estate account was estate property, cannot overcome Sandstead's repeated assertions in the district court that the funds in the Citizens Bank accounts were estate property. See id.
¶ 113 Sandstead argued to the district court and again on appeal that opening the estate account and placing the remaining funds from the original Citizens Bank accounts was not a judicial admission. She urges that her statements on previously filed inventories were not binding upon her because they were merely "inconsistent legal positions or inconsistent legal theories." The district court rejected these arguments.
¶ 114 The district court found that there was no indication in the inventories that Sandstead claimed the listed assets individually rather than as an heir and thus distinguished the case from such cases as Gordon v. Benson, 925 P.2d 775, 781 (Colo.1996), where counsel for one of the parties uttered remarks in recognition of the various theories that might be supported by evidence in that case, while arguing on behalf of one of those theories. The district court also concluded *818 that it is settled law that statements made by a personal representative in an inventory can be the basis of a judgment. Cf. In re Grigsby's Estate, 98 Colo. 489, 494, 56 P.2d 1318, 1320-21 (1936) (where personal representative listed on an inventory promissory notes payable by him to decedent, he admitted valid and enforceable claim against himself). The district court found that, even if not conclusive, the fact that an asset is listed on an estate inventory is at least prima facie evidence of its title. In re Randall's Estate, 77 N.D. 69, 40 N.W.2d 446, 449 (1949) ; see also Giacomini v. Giacomini, 163 Neb. 798, 81 N.W.2d 194, 199 (1957) (a personal representative taking property in her fiduciary capacity is generally estopped to deny title in her decedent). Together with the other evidence in the case, the district court concluded that the inclusion of the Citizens Bank estate account on the inventories of Auriel's estate at least would tend to favor a finding that the assets were estate assets.
¶ 115 I agree with the district court. Thus, I believe Sandstead's actions and statements that the Citizens Bank estate account was estate property were judicial admissions, even if Auriel had not intended that the funds in those accounts be part of her estate.
IV. Pre-appointment Surcharges
¶ 116 I also perceive no error in the district court's conclusion that it could surcharge Sandstead for her expenditure of funds in the Citizens Bank accounts before she was appointed PR.
A. Standard of Review
¶ 117 We review de novo legal conclusions of a district court. E-470 Pub. Highway Auth., 3 P.3d at 22-23. To the extent that Sandstead challenges the district court's conclusion that she did not create an implied trust by transferring money from Wells Fargo to Citizens Bank, that finding is a mixed question of law and fact. Where there is a mixed question of law and fact, we give deference to the district court's factual findings, absent an abuse of discretion, but review de novo the questions of law. Sheridan Redevelopment Agency v. Knightsbridge Land Co., L.L.C. , 166 P.3d 259, 262 (Colo.App.2007).
B. Applicable Law
¶ 118 Article 15 of the Probate Code explains what transpires on the death of an owner of a multi-party account. Section 15-15-212, C.R.S.2015, provides that "on death of a party sums on deposit in a multiple-party account belong to the surviving party or parties." However, such non-probate transfers are subject to probate statutes when there is "a fiduciary or trust account in which the relationship is established other than by the terms of the account." § 15-15-202, C.R.S.2015.
C. Analysis
¶ 119 The majority states that because the Citizens Bank accounts were joint bank accounts and do not fit within a statutory exception, they are non-probate property. I disagree.
¶ 120 The majority states that upon Auriel's death, the money in the Wells Fargo account belonged to Sandstead and Corona in equal shares and, therefore, the Wells Fargo money was not property of Auriel's estate. I agree. From the record, it is unclear whether any of the surcharges imposed by the district court related to the Wells Fargo account. In my view, as discussed above, the surcharges from the Citizens Bank accounts were proper. However, I would remand for the district court to specify whether any surcharges were from the Wells Fargo account. To the extent the district court surcharges concerned transactions related to the Wells Fargo account, I would reverse, because under the multi-party account statutes, those funds were jointly held by Sandstead and Corona on Auriel's death.
¶ 121 However, I conclude the district court did not err in applying section 15-15-202 to the Citizen Bank accounts. Beginning on March 6, 2007, Sandstead became an attorney-in-fact for Auriel. The power of attorney was durable; thus, from that point forward, Sandstead was a fiduciary to her mother. See Moffett v. Life Care Ctrs. of Am., 187 P.3d 1140, 1144 (Colo.App.2008), aff'd, 219 P.3d 1068 (Colo.2009) (noting that the execution of a power of attorney creates a principal-agent relationship); see also *819 In re Trust of Franzen, 955 P.2d 1018, 1021 (Colo.1998) ("A power of attorney is an instrument by which a principal confers express authority on an agent to perform certain acts or kinds of acts on the principal's behalf.").
¶ 122 The majority concludes there was no evidence that the Citizens Bank accounts were created or used as fiduciary or trust accounts. However, as the district court properly concluded, the evidence at trial established that Sandstead was acting at her mother's behest in terms of financial management, and, likewise, failed to support a conclusion that the transfers in question were some type of gift to Sandstead. See § 15-14-606, C.R.S.2015 (duty of agent to act in best interests of principal); Franzen, 955 P.2d at 1021-22 (generally discussing authority of agent under power of attorney); People v. Madison, 176 P.3d 793 (Colo.App.2007) (son accepting responsibilities under power of attorney had duty to act in father's best interests).
¶ 123 The district court found that the evidence was clear and convincing that Sandstead did not "own" the money given to her in joint tenancy, but, rather, was an agent of her mother and her sister, and responsible for her mother's well-being as related to the management of those funds. McClellan v. Morris, 71 Colo. 304, 312, 206 P. 575, 579 (1922) (finding that the power of an agent is to be exercised for the principal's benefit, rather than for the private advantage of the agent). As a result, section 15-15-202 applied to the funds transferred to the Citizens Bank accounts because they were actually established as a type of agency or trust accounts.[7]
V. Attorney Fees and Costs
¶ 124 The district court awarded attorney fees and costs to Corona under section 15-10-504(2)(a). Because I conclude that the Citizens Bank accounts were estate property and that Sandstead owed a fiduciary duty to Corona, I would affirm most of the order awarding attorney fees and costs relating to the Citizens Bank accounts. To the extent any fees and costs relate to the Wells Fargo accounts, it is in the district court's discretion to consider whether to reduce the fees. See Oten v. Colo. Bd. of Soc. Servs., 738 P.2d 37, 42 (Colo.App.1987) ("No reduction is required unless the unsuccessful claim represents a 'substantial separate issue.' " (quoting Duran v. Lamm, 644 P.2d 66, 68 (Colo.App.1981) )).
VI. Conclusion
¶ 125 I would affirm the district court's orders regarding surcharges and attorney fees to the extent they relate to the original Citizens Bank accounts and the Citizens Bank estate account. I would reverse the district court's orders only to the extent the district court determines on remand that any of the surcharges related to funds in the Wells Fargo accounts. Otherwise, I concur with the majority's affirmation of the order enforcing the in terrorem clause.

Sandstead asserted this in her motion for reconsideration or a new trial filed in February 2012.

In March 2011, Sandstead filed a response to Corona's motion for surcharge, attorney fees, and other relief. The majority reads Sandstead's response as notifying Corona and the court that Sandstead considered any dispute relating to spending farm sale proceeds to be off limits. Sandstead wrote: "Monies held in joint bank accounts due to the decedent putting that money into a joint bank account before her death deprives the probate court of jurisdiction to administer those funds or to adjudicate how those funds were spent." Sandstead was correct that Auriel placing money in the Citizens Bank accounts did not make that money estate property. The majority does not recognize the distinction I make between the Citizens Bank accounts and the Citizen Bank estate accounts. The Citizens Bank estate accounts were estate property because of Sandstead's judicial admissions. I do not state that the Citizens Bank accounts prior to being converted into estate accounts were estate property. Therefore, Sandstead's focus on the accounts at the time that Auriel was alive does not change my position.

Part III, infra, will analyze the issue of the judicial admissions.

See infra Part IV for an analysis of the fiduciary relationship.

The majority cites part of a discussion between the district court and Sandstead's counsel at the beginning of the motion in limine hearing. After the conversation cited by the majority, the court stated that the treatment of the Citizens Bank funds as estate property might "sound like a loan, a loan to the estate." Sandstead's counsel replied, "That's one way I thought it could be analyzed. It could be a loan to the estate, and I guess it could be pigeonholed or boxed in a number of ways; a loan is one way, I agree." The court responded, "Maybe not the only way, but sounds to me like a loan." I do not consider the court ruminating that the money could be a loan as a ruling on whether such funds were not estate property so as to preclude it from taking a contrary position later.

To the extent the majority characterizes the filing of the estate inventory as related to probate, rather than litigation, I disagree. Sandstead filed her estate inventory only after Corona petitioned for Sandstead's removal as PR, appointment of a successor PR, a proper accounting and inventory, as well as supervised administration of the estate. Therefore, unlike In re Estate of Hill, 281 Mont. 142, 931 P.2d 1320, 1325 (1997), the estate inventory here was made in the context of litigation.

The majority suggests that the district court violated Sandstead's rights to notice and to present evidence when it granted Sandstead's motion in limine and then later reversed its ruling. Although Sandstead's motion did not specifically refer to C.R.C.P. 59(d), the district court noted Sandstead's arguments most closely related to C.R.C.P. 59(d)(1), irregularities preventing a party from a fair trial. A C.R.C.P. 59(d)(1) motion must be supported by an affidavit. See In re Petition of Taylor, 134 P.3d 579, 583 (Colo.App.2006). The district court noted that Sandstead's motion did not comply with the requirements of C.R.C.P. 59(d). I agree. No affidavit was attached to Sandstead's motion. Further, as the district court noted, Sandstead did not specify what she would have done had she received "adequate notice of the claims asserting a breach of fiduciary duty over bank funds." See Kelley v. Colo. Mobile Home Licensing Bd., 662 P.2d 199, 200 (Colo.App.1983) (conclusory allegations are insufficient under the rule).