COLORADO COURT OF APPEALS
 2016 COA 49
 
 

Court of Appeals No. 14CA0231
Logan County District Court No. 09PR30
Honorable Michael K. Singer, Judge

In re the Estate of Auriel Josephine Sandstead, a/k/a Auriel J. Sandstead, a/k/a Auriel Sandstead, deceased.
Vicki J. Sandstead,
Appellant and Cross-Appellee, 
v.
Shauna Sandstead Corona, 
Appellee and Cross-Appellant.

ORDERS AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS
Division I
Opinion by JUDGE J. JONES
Harris, J., concurs
Taubman, J., concurs in part and dissents in part
Announced April 7, 2016

Peter R. Bornstein, Greenwood Village, Colorado, for Appellant and Cross Appellee
Solem Mack & Steinhoff PC, Peter T. Harris, Nathan C. Williams, Englewood, Colorado, for Appellee and Cross Appellant
¶1       This is a probate case. The former personal representative (PR) of the estate, Vicki J. Sandstead (Sandstead), appeals five orders: (1) the October 4, 2011, order regarding the motion for surcharge; (2) the May 11, 2012, order denying her motion for reconsideration or for a new trial; (3) the June 14, 2012, order granting in part, and reserving in part, the motion for surcharge and other relief; (4) the December 9, 2013, order concerning attorney fees, costs, and expenses; and (5) the December 20, 2013, order concerning the motion for final surcharge. We affirm in part, reverse in part, and remand with directions the first, third, and fifth orders regarding surcharges. Because of how we resolve Sandstead’s challenges to the first, third, and fifth orders, we need not address the second order denying the motion for reconsideration or for a new trial. We vacate and remand the fourth order concerning attorney fees, costs, and expenses.
¶2       Shauna Sandstead Corona (Corona), an heir of the decedent, cross-appeals the district court’s October 21, 2013, order enforcing an in terrorem clause. We affirm that order.
I. Background
¶3       Willard and Auriel Sandstead were married, had three
daughters, and lived in Sterling, Colorado. They owned several pieces of real property (a farm in Colorado, a condominium in Florida, and a house in Sterling, Colorado) and a large collection of personal items.
¶4       Willard and Auriel executed wills in 1991; ubsequently, they each executed second wills and a related revocable trust in 2000. On February 28, 2007, they signed a revocation of the revocable trust on advice from their attorney, who had not seen the trust. And on March 6, 2007, they also signed durable powers of attorney naming two of their daughters — Sandstead and Corona — as their attorneys-in-fact.
¶5       Throughout their lives, Willard and Auriel sought to minimize or avoid probate of their estates upon their deaths. They took steps to simplify their affairs so that Sandstead and Corona would divide their property equally without the property entering probate.[1]
¶6       One such step involved the sale of the family farm. Willard and Auriel began to arrange the sale before Willard’s death. Willard died on March 14, 2007. Auriel proceeded with the sale and put the money from the sale into an account at Wells Fargo bank in Sterling. The Wells Fargo account was a multi-party account with Auriel, Sandstead, and Corona as joint signatories. It is undisputed that Auriel placed the farm sale funds into this multi-party account to avoid probate on her death.
¶7       After Willard’s death, Auriel opened his estate by lodging his will from 1991, but did not tell her attorney that Willard had executed a second will in 2000.
¶8       In June 2007, Sandstead moved about $200,000 from the Wells Fargo account to Citizens Bank accounts in Boston, where Sandstead lived.[2] The only two signatories on the Citizens Bank accounts were Sandstead and Auriel; though Corona was aware of the accounts, she was not a signatory on any of those accounts because of logistical difficulties relating to Corona living in Mexico (where she had lived since 1977). Sandstead testified that her mother agreed to move the money because Sandstead had had a falling out with a banker at Wells Fargo and it would be easier for Sandstead to manage the funds where she lived. Sandstead considered the money in the Citizens Bank accounts to be Auriel’s money to be used for Auriel’s care until her death, and then to be split equally between herself and Corona, as her parents intended.
¶9       Both Sandstead and Corona were placed on the titles for the house in Sterling and the condominium in Florida before their parents’ deaths.[3] Before Auriel’s death, Sandstead used money from the joint Citizens Bank accounts to pay for work and trips allegedly related to the condominium in Florida.
¶10 Auriel died on November 25, 2007. On that date, the Wells Fargo account had a balance of $67,972, and the Citizens Bank accounts had a total balance of $179,790.46.
¶11       On June 18, 2008, both Sandstead and Corona met with their parents’ lawyer to sign a small estate affidavit representing that the value of the estate was less than $50,000.[4] Willard and Auriel’s lawyer believed a small estate affidavit was appropriate since Willard and Auriel had deeded their real property to their daughters and had placed their money in joint bank accounts, leaving only personal property in the estate.[5]
¶12       About a year later, Sandstead contacted an attorney because she believed personal items were missing from her mother’s estate. The attorney told Sandstead that to try and reclaim estate property, she would have to file a probate case. Sandstead opened a probate case, and was appointed PR in June 2009. After being appointed PR, Sandstead opened an estate account at Citizens Bank and placed funds from the other Citizens Bank accounts into this estate account.
¶13       After their mother’s death, Sandstead and Corona began to disagree about matters relating to their parents’ former property. Disagreements arose regarding gifts from the estate, expenditures from the bank accounts, and distribution of money.
¶14       On May 11, 2010, Corona filed a petition to remove Sandstead as PR. On June 10, 2010, Sandstead resigned as PR, and she and Corona agreed to the appointment of a successor.
¶15       On February 10, 2011, Corona filed a motion for surcharge, attorney’s fees, and other relief against Sandstead expressly limited to Sandstead’s alleged actions as PR. See § 15-10-504(2), C.R.S. 2015 (providing that a court may surcharge a "fiduciary for any damage or loss to the estate, beneficiaries, or interested persons" resulting from a breach of fiduciary duty or improper exercise of power by a fiduciary). The motion alleged, in only the most general terms, mismanagement of estate funds and property, and "damage or loss to the estate and/or to [Corona]."
¶16       On July 11, 2011, seven days before the surcharge hearing, Sandstead filed a motion in limine to prohibit evidence regarding the $230,000 transferred from the Wells Fargo account to Citizens Bank because the transfers had occurred before Auriel’s death and the funds were not property of Auriel’s estate. The court granted the motion in limine, ruling that because Corona had sued Sandstead only in her capacity as PR, the court did not have personal or subject matter jurisdiction regarding any claims against Sandstead as an alleged fiduciary before being appointed PR.
¶17       Despite granting the motion in limine, at the hearing on July 18, 2011, the court allowed Corona’s attorney to ask questions about transactions and money transfers occurring before Auriel’s death. The court said such questioning was relevant to trace where the estate account money came from, but agreed with Sandstead’s attorney that it was not relevant to any dispute between the sisters regarding funds expended before Sandstead was appointed PR because that was not a probate issue. At the hearing, Corona’s counsel argued repeatedly that Sandstead had breached her fiduciary duties to Corona personally.[6]
¶18       In its first written post-hearing order on the motion for surcharge, the court found, notwithstanding its prior rulings, and notwithstanding Corona’s counsel’s contention that Sandstead had violated her fiduciary duties to Corona, that Sandstead was an estate fiduciary as to the money in Citizens Bank accounts because Sandstead had acted under an agency created by the March 2007 durable power of attorney in transferring the money from Wells Fargo to Citizens Bank, and had established an implied trust, the assets of which were later administered in the estate under Sandstead’s authority as PR. The court determined that its prior granting of the motion in limine was merely a preliminary order that it could reconsider based on changed circumstances; the evidence at trial persuaded the court to change course. The court ordered surcharges against Sandstead for actions she took before Auriel’s death; after Auriel’s death, but before her appointment as PR; and after her appointment as PR. Many of those actions related to the farm sale funds originally placed in the Wells Fargo account, but some related to tangible estate property. The court reserved judgment on certain potential surcharges pending investigation and reports.
¶19       Sandstead filed a motion for reconsideration or for a new trial in February 2012, objecting to the court’s decision to surcharge her for actions predating her appointment as PR and relating to expenditures of funds transferred from the Wells Fargo account before Auriel’s death. The court denied the motion on May 11, 2012.
¶20       That same day, Corona filed a motion for final surcharge and other relief. The court issued an order granting the motion in part and reserving ruling in part on June 14, 2012.
¶21       Sometime after the surcharge hearing, Willard and Auriel’s 2000 wills and the 2000 revocable trust instrument were discovered. On September 21, 2012, Sandstead filed a petition for formal probate of Auriel’s 2000 will and a motion for determination of the validity of the 2000 revocable trust. In 2013, the court held a hearing on the validity of the 2000 will and revocable trust. Corona challenged the validity of the 2000 revocable trust because of the written revocation signed by both Willard and Auriel. Corona contended Willard and Auriel had also revoked their 2000 wills because they were unaware those wills existed, had relied on their 1991 wills, and their conduct indicated their intention that their estate be divided evenly between Sandstead and Corona. (The 2000 wills and trust gave ten percent of their residual estates to each of two grandsons and forty percent each to Sandstead and Corona, thereby reducing each sister’s share.)
¶22       The court held a hearing on the validity of the 2000 will and trust on February 25, 2013, and admitted Auriel’s 2000 will to probate on March 21, 2013.
¶23       The court found the trust revocation was invalid because of Willard and Auriel’s impaired functioning and insufficient information from their attorney. The court also found that Auriel’s 2000 will was valid because under section 15-11-507(1) and sections 15-11-803 and -804, C.R.S. 2015, a will can be revoked in only two ways — by a physical act or by means of a later will — and neither had occurred. And the court found that there was no evidence Willard and Auriel intended to disinherit their grandchildren. 
On September 30, 2013, Sandstead and her two nephews filed a motion to enforce the incontestability provision (the so-called "in terrorem clause") in the 2000 trust. They argued that because Corona had contested the validity of the 2000 will and trust, she could no longer be a beneficiary of either. Corona argued that the in terrorem clause was not enforceable because she had probable cause to challenge both the 2000 will and the trust.
¶24       On October 21, 2013, the court issued an order enforcing the in terrorem clause as to the 2000 will but not as to the trust. The court found that while Corona had probable cause to challenge the trust — based on the written revocation — she lacked probable cause to challenge the will; Corona had not produced evidence that she could reasonably have thought the will had been revoked by either means authorized under the Probate Code, and there was no evidence that Willard and Auriel had intended to disinherit their grandchildren.[7]
¶25       Corona filed a motion to reconsider, which the court denied. On December 9, 2013, the court issued an order granting Corona attorney fees and costs relating to the surcharge motion. And on December 20, 2013, the court issued an order against Sandstead and in favor of the estate concerning the motion for final surcharge.
II. Discussion
¶26       Sandstead contends that the district court erred by: (1)
surcharging her for actions she took before her appointment as PR relating to non-probate funds; (2) surcharging her for actions as to which the court had ruled Corona could not present evidence; and (3) awarding attorney’s fees to Corona.
¶27       Corona contends that the district court erred in enforcing the in terrorem clause to preclude her from benefiting under Auriel’s 2000 will.
¶28       We address each party’s contentions in turn.
A. Surcharges
¶29       In essence, Sandstead contends that the statutes under which probate cases are administered, and which pertain specifically to the surcharging of fiduciaries, did not give the district court authority to decide disputes between her and Corona over expenditure of the farm sale proceeds because those funds were not estate funds and she did not expend those funds in any fiduciary capacity vis-à-vis the estate.
1. Standard of Review
¶30       Sandstead does not challenge historical facts found by the district court.[8] Rather, she challenges the court’s application of the law to those facts. Her arguments present issues of statutory interpretation, which we review de novo. Oldham v. Pedrie, 2015 COA 95, ¶9. When interpreting statutes, we give effect to the General Assembly’s intent. Id. (citing Jefferson Cty. Bd. of Equalization v. Gerganoff, 241 P.3d 932, 935 (Colo. 2010)). To determine the General Assembly’s intent, we consider the context of the statute as a whole and look to the statute’s plain language, giving that language its commonly understood meaning. Id.; accord Farmers Grp., Inc. v. Williams, 805 P.2d 419, 422 (Colo. 1991).
2. Multi-Party Bank Accounts
¶31       Part 5 of article 10 of the Probate Code gives a court authority to take actions with respect to certain "fiduciaries" over which it has acquired jurisdiction to protect the interests of those as to whom fiduciaries owe their duties. As immediately relevant, the court may surcharge a PR — that is, order a PR to reimburse the estate — for mismanagement of an estate. See §§ 15-10-501(2)(c), (3), -504(2), C.R.S. 2015. An "estate" means, again as relevant here, "the estate of a decedent." § 15-10-501(2)(b). "Estate" is further defined as "the property of the decedent." § 15-10-201(17), C.R.S. 2015. In delineating the court’s powers to oversee and sanction a PR, part 5 repeatedly phrases that power in terms of actions with respect to estate property. §§ 15-10-501(2)(b), (c), (3); 15-10-502(1)(a); 15-10503; 15-10-504(1)(a); 15-10-505(1)(a), C.R.S. 2015. We are convinced, therefore, that any proceeding to surcharge a PR of an estate must pertain to the PR’s actions vis-à-vis estate property.
¶32       Sandstead contends that the district court should not have surcharged her for actions related to the farm sales proceeds, which were placed in joint bank accounts before Auriel’s death, because that money was not estate property. We agree.
¶33       Sums in a joint bank account are non-probate property. "During the lifetime of all parties, an account belongs to the parties in proportion to the net contribution of each to the sums on deposit." § 15-15-211(2), C.R.S. 2015. But, upon one party’s death, the money automatically passes by operation of law to the surviving parties on the account. § 15-15-212(1), C.R.S. 2015. "If two or more parties survive and none is the surviving spouse of the decedent, the amount to which the decedent . . . was beneficially entitled under section 15-15-211 belongs to the surviving parties in equal shares . . . ." Id. "Sums remaining on deposit at the death of a party to a multiple-party account . . . belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention." § 15-15-212(5) (emphasis added). And "a transfer resulting from the application of section 15-15-212 is effective by reason of the terms of the account involved and this part 2 and is not testamentary or subject to articles 10 to 13 of this title (estate administration)." § 15-15-214, C.R.S. 2015 (emphasis added).
¶34       In re Estate of Beasley, 40 Colo. App. 347, 578 P.2d 662 (1978), is substantially on point. In that case the decedent established two savings accounts before her death in her name and those of her two daughters. The accounts were in joint tenancy, with rights of survivorship. The parties intended that upon the death of one of them, the others would receive the entire amount in the accounts. Shortly before the decedent died, one of the sisters withdrew substantially all of the funds in the accounts. After the decedent died, the other sister, who was the estate’s PR, asserted a claim for half of the withdrawn funds on behalf of the estate. The district court awarded the estate half the funds, but a division of this court reversed. The division held that under the terms of the account the withdrawals were lawful, and that those withdrawals did not destroy the joint tenancy nature of the account. Accordingly, the estate had no claim to the funds. Id. at 348-49, 578 P.2d at 663.
¶35       In this case, it is undisputed (and the district court so found) that Auriel contributed all of the money in the Wells Fargo and Citizens Bank accounts, intending that the funds would go to Sandstead and Corona upon her death without going through probate. It is likewise undisputed that the transfer to the Citizens Bank accounts was made for the same purpose. By operation of law, during Auriel’s lifetime, the money in the Wells Fargo account was hers, though both Sandstead and Corona could withdraw funds. Likewise, by operation of law, during Auriel’s lifetime the money in the Citizens Bank accounts was hers, though Sandstead could withdraw funds. But upon Auriel’s death, by operation of law, the money in the Wells Fargo account belonged to Sandstead and Corona in equal shares while the money in the Citizens Bank accounts belonged to Sandstead alone (subject to Corona’s claim to one-half of the funds); the estate had no claim to the money. See § 15-15-212(1), (5); § 15-15-214; In re Estate of Beasley, 40 Colo. App. at 347-48, 578 P.2d at 663.[9] Thus, because there is not "clear and convincing evidence" that Auriel intended the money to be subject to probate (indeed, all evidence is to the contrary), see § 1512-212(5), by law the money in the accounts was never property of Auriel’s estate.
¶36       Taking a position Corona never asserted, the district court applied an exception to the rules governing multi-party accounts to conclude that the funds in the Citizens Bank accounts were estate property. Under section 15-15-202, C.R.S. 2015, the provisions of title 15, section 15 regarding multi-party accounts do not apply to "a fiduciary or trust account in which the relationship is established other than by the terms of the account." The district court determined that section 15-15-202 applied to Sandstead’s account transfers because in transferring money from Wells Fargo to Citizens Bank, she created a type of trust account.[10] We disagree because there is no evidence the farm sale proceeds were placed in these accounts for any purpose other than to avoid probate; indeed, it is undisputed that the money was placed in these accounts precisely to avoid probate by operation of the rules governing multiparty accounts. Sandstead testified, without contradiction, that the money was transferred because she had had a falling out with a Wells Fargo employee and it would be easier to manage the funds where she lived. Sandstead and Corona agreed all along that the money was to be used for Auriel’s care, and then split between them upon Auriel’s death. However, this was not a strict or formal arrangement. While Auriel was still alive, the money was also used to pay for things like renovations to the Florida condominium (which had been deeded to the sisters) and travel expenses. There is simply no evidence the accounts were created or used as a fiduciary or trust accounts.
¶37       Apparently, the district court based its conclusion on the fact that Sandstead was Auriel’s attorney-in-fact at the time of the transfer by virtue of the durable power of attorney.[11] But Sandstead did not use that authority or need to use that authority to make the transfer; her status as signatory was alone sufficient to allow her to do so.
¶38       The fact a person possesses a power of attorney to act for another person does not transform every action affecting the other person by the one in possession of such power into one pursuant to that power. The purpose of a durable power of attorney is obviously to allow the holder of that power to do things she otherwise would have no legal authority to do. And using such a power requires presenting the document creating it to establish one’s authority to act. For instance, Sandstead testified that she had to "send [the] power of attorney to some of the billing companies to stop billing, or to make payments, or to close accounts" after her parents died. But Sandstead had legal authority to transfer the funds in the Wells Fargo account independent of the power of attorney, and there was no evidence that she acted pursuant to or presented the power of attorney for that purpose.
¶39       The district court also concluded that the Citizens Bank money was estate property because Sandstead had put some of the money in a Citizens Bank estate account in 2009 and had listed the amount in a Citizens Bank estate account in two estate inventory forms after opening formal probate in 2009. The district court said that Sandstead’s "treatment of the Citizens’ Bank Funds as estate property constituted a judicial admission that she did not claim them, individually. "[12] Again, we disagree.
¶40       "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." Kempter v. Hurd, 713 P.2d 1274, 1279 (Colo. 1986).
¶41       We conclude that there was no judicial admission, for three reasons. First, we are not persuaded that the context of Sandstead’s actions shows an unequivocal, deliberate declaration that the farm sale proceeds were estate funds. See Gonzalez v. Windlan, 2014 COA 176, ¶¶45-46 (alleged judicial admission must be considered in context). Sandstead testified that she placed some of the farm sale proceeds in an estate account and showed them on estate inventory forms because of perhaps dubious legal advice that doing so would facilitate resolution of disputes over other property that did belong to the estate. There was no contrary evidence. She has at all times since they became an issue maintained that the farm sale proceeds were never estate funds.[13] And we note that because at all relevant times Sandstead and Corona believed themselves to be the sole heirs of Auriel’s estate, disbursing the funds through probate would have the same effect as disbursing them outside probate — both would receive one-half of the funds. See Bd. of Cty. Comm’rs v. Rohrbach, 226 P.3d 1184, 1189 (Colo. App. 2009) (where property owners contested the zoning of their property in the litigation, statement in their use permit application that their property was zoned agricultural was not an unequivocal or formal declaration so as to constitute a judicial admission).
¶42       The partial dissent says, however, that Sandstead did not claim that the farm sale proceeds were not estate funds until July 2011. But the record shows that Sandstead took that position earlier when the status of the funds first appeared to be an issue. And the record shows that Sandstead continued to adhere to that position throughout litigation over her actions.
¶43       As noted, the motion for surcharge expressly challenged only actions Sandstead had taken as PR relating to estate property. Sandstead was not appointed PR until two years after she had transferred the money to Citizens Bank.
¶44       In her response to the motion for surcharge, filed March 2, 2011, Sandstead let it be known that she considered any dispute relating to spending farm sale proceeds to be off limits. The response stated: "Monies held in joint bank accounts due to the decedent putting that money into a joint bank account before her death deprives the probate court of jurisdiction to administer those funds or to adjudicate how those funds were spent."
¶45       Both Sandstead and Corona filed trial briefs on July 8, 2011, in advance of the hearing on the surcharge motion. In her trial brief, Sandstead again argued expressly that the farm sale proceeds transferred to Citizens Bank were not estate property because those funds were in "a joint bank account which passed to the survivor outside of the will."[14]
¶46       Corona’s trial brief sought, for the first time, to challenge actions Sandstead took before her appointment as PR, and claimed that, as to all the money transferred to Citizens Bank, Sandstead had breached her fiduciary duties to Corona. The brief referred to three separate transfers: (1) a transfer of "$200,000 from a bank account in Colorado that was jointly owned by [Auriel], [Sandstead], and [Corona] to accounts in Massachusetts" on "June 20, 2007"; (2) a transfer of "$10,000" on "August 2, 2007"; and (3) a transfer of "$20,000" on "November 19, 2007." Corona’s brief did not allege expressly that the money in the Citizens Bank accounts was estate property, nor did it allege expressly that Sandstead had breached any duty to Auriel or the estate with respect to that money. It did allege that Sandstead had breached her fiduciary duties to Corona "with [r]espect to [f]unds [c]ontrolled by [Sandstead] as well as [e]state [p]roperty," placing the farm sale proceeds in the former category by then alleging that Sandstead controlled those proceeds "which [Sandstead] held for the benefit of them both."
¶47       It was in response to Corona’s new allegations that Sandstead filed her motion in limine three days later.[15] She expressly moved "to prohibit the introduction of evidence regarding" all three transfers mentioned in Corona’s trial brief, including "$200,000 transferred from a jointly owned bank account on June 20, 2007, while the Decedent was still alive . . . ." The motion argued that the court lacked jurisdiction to resolve disputes over those "non-estate funds." As to the $200,000 transfer to Citizens Bank specifically, the motion also said as follows:

  "1. On page 1 of [Corona’s] Trial Brief, [Corona] describes a transfer of $200,000 from a bank account in Colorado that was owned jointly by [Auriel], [Sandstead], and [Corona] to accounts in Massachusetts that were owned by [Auriel] and [Sandstead] only."

 "2. This statement is repeated on page 5 under the heading entitled ‘The Respondent was Acting as Petitioner’s Fiduciary With Respect to Funds Controlled by Respondent as Well as Estate Property."

 "8. . . . This Court does not have subject matter jurisdiction to litigate an expanded claim for breach of fiduciary duty involving over $200,000 worth of funds that were transferred from a bank account to which Vicki Sandstead was a signatory and owner which transfers were made during the [Auriel’s] lifetime and with [Auriel’s] knowledge and permission."

¶48       In claiming that the motion in limine "indicated at most, that the $30,000 of the funds in the Citizens Bank account . . . were not part of the estate" the dissent ignores the plain language of the motion and of Corona’s trial brief to which it was responding. The motion is crystal clear that Sandstead’s position was that none of the money transferred to Citizens Bank was estate property.
¶49       Second, there is no indication that the statements in the estate inventory forms were made "for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." Kempter, 713 P.2d at 1279; see Salazar v. Am. Sterilizer Co., 5 P.3d 357, 365 (Colo. App. 2000) (allegation in complaint was not a judicial admission because it was not unequivocal and because there was no indication it was made for the purpose of dispensing with proof of an issue in the litigation). As noted, from the onset of litigation pertaining to the funds, Sandstead maintained that they were not estate property. And the context of the statement was probate, not litigation in which the ownership of the funds was at issue. Cf. In re Estate of Hill, 931 P.2d 1320, 1325 (Mont. 1997) (party’s signing of estate inventory form listing bank accounts as estate property was not a judicial admission because it was made in the context of probate, not litigation).
¶50 The dissent says that the statements were made in the context of litigation simply because Corona at one point moved to remove Sandstead as PR and later filed a motion for surcharges. Again, this is mistaken.
¶51       Neither the motion to remove Sandstead as PR nor the motion for surcharges requested that Sandstead be required to file estate inventory forms. Sandstead filed those forms in her capacity as PR as required by section 15-12-706(1), C.R.S. 2015 (requiring a PR to file such a form "[w]ithin three months after [her] appointment"); and by section 15-12-708, C.R.S. 2015 (requiring a PR to file a supplementary inventory if additional information comes to light). She filed both forms before Corona gave anyone any indication that she was making any claim regarding the money in the Citizens Bank accounts. And Corona did not even mention the inventory forms until after Sandstead had filed them, and even then did so in her trial brief only in passing to note that Sandstead had filed such forms.[16]
¶52       Third, the status of the funds is largely a legal question, determined by statutes governing multi-party bank accounts and principles of estate and trust law. The judicial admission doctrine does not apply to questions of law. See Rohrbach, 226 P.3d at 1189; Miller v. Brannon, 207 P.3d 923, 929 (Colo. App. 2009).
¶53 In sum, we conclude that the district court erroneously applied the law in determining that the farm sale proceeds were estate funds. By law they were never estate funds, and therefore the court could not surcharge Sandstead for her expenditure of those funds.
3. Fiduciary Duty Before Appointment as PR
¶54       Sandstead also contends she should not be surcharged for actions she took before the court appointed her PR of the estate because she had no fiduciary duty to the estate before her appointment. Again, we agree.[17]
¶55       Corona requested surcharges against Sandstead in her role as PR under section 15-10-504(2); however, the district court also surcharged Sandstead for actions she took before her appointment as PR. The district court ruled it could surcharge Sandstead for such actions because she acted as a fiduciary under sections 1510-501(1) and 15-10-501(2)(c) as both her mother’s agent under the durable power of attorney and as a trustee of an implied trust regarding the money in the joint bank accounts. The district court erred.
¶56       As discussed, the farm sale proceeds never became estate funds. Nor was there any evidence Sandstead acted pursuant to the power of attorney with respect to those proceeds. And there is no basis in the record for imposing or finding an implied trust regarding the farm sale proceeds vis-à-vis the estate. "Both resulting and constructive trusts are implied trusts, where the intent of the parties to form a trust is not apparent." Shepler v. Whalen, 119 P.3d 1084, 1089 (Colo. 2005) (adopting the analysis of George Gleason Bogert & George Taylor Bogert, Trusts & Trustees § 451, at 225 (2d rev. ed. 1991)). Resulting trusts are "intent-enforcing" trusts while constructive trusts are "fraud-rectifying" trusts. Id. A resulting trust is "[a] remedy imposed by equity when property is transferred under circumstances suggesting that the transferor did not intend for the transferee to have the beneficial interest in the property." Black’s Law Dictionary 1746 (10th ed. 2014). And a constructive trust is "[a]n equitable remedy by which a court recognizes that a claimant has a better right to certain property than the person who has legal title to it." Id. at 1742. The district court did not specify which type of implied trust was created when Sandstead moved money from Wells Fargo to Citizens Bank; however, we find no basis for either.
¶57       As discussed, Sandstead had legal authority independent of the power of attorney or her relationship with her mother to move money from Wells Fargo to Citizens Bank. See In re Estate of Beasley, 40 Colo. App. at 348-49, 578 P.2d at 663. There is no evidence of fraud (and the court did not find fraud). Thus, imposition of an implied trust was not an appropriate remedy. Therefore, we conclude that there was no legal basis for the district court’s purported exercise of jurisdiction over Sandstead’s pre-appointment conduct.[18] Under the circumstances, prior to her appointment, Sandstead was not a fiduciary of the estate.[19] Thus, surcharging her for the estate’s benefit for acts prior to her appointment (and which related to non-estate funds) was not allowed by section 15-10-504.
¶58       Because the money in the joint bank accounts was never estate property, and because Sandstead did not act as a fiduciary vis-à-vis the estate before her appointment as PR, we reverse and remand for the district court to determine what surcharges remain against Sandstead for her actions after appointment as PR.[20] Because of how we resolve the surcharge issues as to Sandstead’s actions before her appointment as PR, we need not address her contention regarding her motion to reconsider.[21]
B. Attorney Fees and Costs
¶59       The district court awarded attorney fees and costs to Corona under section 15-10-504(2)(a), which allows an award of attorney fees and costs where the court finds a breach of fiduciary duty has occurred. Based on our resolution of Sandstead’s other contentions, we vacate the order awarding attorney fees and costs. We remand for the district court to re-evaluate and award attorney fees and costs based on Sandstead’s actions relating to estate property while she was PR.
C. In Terrorem Clause
¶60       We reject Corona’s contention on cross-appeal that the court erred by enforcing the in terrorem clause.
1. Standard of Review and Applicable Law
¶61       Interpretation of a will or a trust is a question of law we review de novo. In re Estate of Hope, 223 P.3d 119, 122 (Colo. App. 2007); Matter of Trusts Created by Ferguson, 929 P.2d 33, 35 (Colo. App. 1996). We strive to give effect to the intent of the testator. In re Estate of Hope, 223 P.3d at 122.
¶62       Courts generally do not enforce an in terrorem (no-contest) clause when a beneficiary acts in good faith and has probable cause to challenge the will. In re Estate of Peppler, 971 P.2d 694, 697 (Colo. App. 1998); see § 15-12-905, C.R.S. 2015. In the context of wills, probable cause is "the existence, at the time of the initiation of the proceeding, of evidence which would lead a reasonable person, properly informed and advised, to conclude that there is a substantial likelihood that the contest or attack will be successful." In re Estate of Peppler, 971 P.2d at 697 (quoting Restatement (Second) of Property § 9.1 cmt. j (Am Law Inst. 1981)). A finding of probable cause requires "a determination of whether a ‘reasonable person, properly informed and advised’ would have concluded" that a challenge to the will would succeed. Id. at 698.
¶63       "Whether a beneficiary’s acts violate a no-contest clause may depend on how broadly the clause is drafted." Id. at 696 (citing M. Begleiter, Anti-Contest Clauses: When You Care Enough to Send the Final Threat, 26 Ariz. St. L.J. 629 (1984)). A testator’s choice of words may evidence an intent to broaden the applicability of a no-contest clause. Id. (finding the words "directly or indirectly" were evidence of testator’s intent to broaden the applicability of a no-contest clause such that offering a subsequent will for probate constituted a contest of the original will).
¶64       Colorado law provides two means of revoking a will: (1) "[b]y executing a subsequent will that revokes the previous will" or (2) "[b]y performing a revocatory act on the will," i.e. "burning, tearing, canceling, obliterating, or destroying the will . . . ." § 15-11-507(1)(a) & (b).
2. Enforcement of the In Terrorem Clause
¶65       Corona argues that (1) the in terrorem clause applies only to the trust and (2) she had probable cause to challenge the validity of the will.
¶66       "A writing in existence when a will is executed may be incorporated by reference if the language of the will manifests this intent and describes the writing sufficiently to permit its identification." § 15-11-510, C.R.S. 2015; see Denver Found. v. Wells Fargo Bank, N.A., 163 P.3d 1116, 1122 (Colo. 2007) (when determining a settlor’s intent, all documents at issue — including those incorporated by reference— are read as a whole).
¶67       Auriel’s 2000 will expressly incorporates the trust "specifically and completely" by reference. So, although the physical text of the trust, not that of the will, contains the in terrorem clause, that clause is part of the will.
¶68       We agree with the district court that Corona did not have probable cause to challenge Auriel’s will. In its order enforcing the in terrorem clause, the district court found there was probable cause to challenge the trust because Willard and Auriel had signed a written revocation of the trust and attempted to transfer land out of the trust. However, the court found no evidence of probable cause to challenge the will.
¶69 As stated above, there are two ways to revoke a will in Colorado: (1) executing a subsequent will or (2) physically destroying the will. § 15-11-507(1); In re Estate of Schumacher, 253 P.3d 1280, 1282 (Colo. App. 2011) ("A will can be revoked only in the manner provided by statute, and the statutory provisions for revocation of wills must be strictly construed." (quoting In re Estate of Haurin, 43 Colo. App. 296, 297, 605 P.2d 65, 66 (1979))); Matter of Tong’s Estate, 619 P.2d 91, 91 (Colo. App. 1980) ("A will is revoked if, with intent to revoke, a testator performs any one of the acts deemed sufficient by statute to effectuate a revocation."). The court found no evidence that Corona could have reasonably thought the will had been revoked by either of these means. The court noted that there was no evidence of a subsequent will and no evidence that Willard and Auriel ever attempted to physically destroy their 2000 wills. The statutory requirements for revocation were unmet, and Corona could not reasonably have believed otherwise.
¶70       Corona nonetheless contends the district court should not have limited itself to the two statutory revocation methods and erred by not considering other factors such as intent, presumptive revocation of a will when a trust is revoked, equity, and mistake. However, Corona does not cite — and we could not find — legal support for her argument that such factors supersede statutory authority regarding will revocation. Indeed, Colorado law is to the contrary. In re Estate of Schumacher, 253 P.3d at 1282; In re Estate of Haurin, 43 Colo. App. at 297, 605 P.2d at 66.[22]
¶71       Nor are we persuaded by Corona’s argument that the district court as much as found probable cause to challenge the will when it said that she "had to" challenge the will. The court said Corona had to challenge the will when observing that for Corona to accomplish her goal of defeating her parents’ intent to provide for their grandchildren, she needed to challenge both the will and the trust. The court did not thereby imply that any challenge to the will was supported by probable cause.
¶72       And finally, we are not persuaded by Corona’s argument that the incorporation clause was subject to an unfulfilled condition precedent — i.e., that the trust not be in effect upon Auriel’s death. Grammatically speaking, the clause incorporating the trust was not dependent on whether the trust was in effect on Auriel’s death.
III. Conclusion
¶73       The orders regarding surcharges are affirmed in part and reversed in part. The case is remanded for recalculation of surcharges based only on Sandstead’s actions relating to estate property while she served as PR.
¶74       The order regarding attorney fees, costs, and expenses is vacated. On remand, the court should reconsider its award based on the outcome of this appeal.
¶75       The order enforcing the in terrorem clause is affirmed. JUDGE HARRIS concurs.

[1] They intentionally disinherited their third daughter.
 [2] Sandstead transferred an additional $30,000 to Citizens Bank later in 2007.
[3] The trust held title to the condominium and house when they were deeded to Sandstead and Corona. When the district court ruled the trust had not been revoked and was still valid, the deeds were deemed invalid. Neither party appeals this issue.
[4] To avoid formal probate for small estates, section 15-12-1201(1)(a), C.R.S. 2015, allows small estate administrative procedures where the estate "does not exceed twice the amount set forth in section 15-11-403, as adjusted by section 15-10-112."
[5] Both Sandstead and Corona testified to this.
[6] As discussed below, Corona’s trial brief argued similarly, at least as to the money in the Citizens Bank accounts.
[7] The court also noted that if, as Corona claimed, her parents were unaware of the 2000 wills, "it was hard to imagine how Ms. Corona could honestly believe that her parents ‘revoked’ such a will."
[8] The one possible exception is her contention that she did not create an implied trust by transferring money from Wells Fargo to Citizens Bank in 2007. To the extent that finding is factual in nature, or based on factual findings that Sandstead disputes, we review for clear error. Van Gundy v. Van Gundy, 2012 COA 194, ¶12.
[9] Sandstead conceded at the surcharge hearing that one-half of the funds in the Citizens Bank accounts belonged to Corona because of their parents’ intent that they split the farm sale proceeds outside of probate.
[10] Of course, that rationale would not apply to funds that remained in the Wells Fargo account, but the district court did not make that distinction.
[11] Corona made no such argument in the district court.
[12] This position was contrary to the position the district court took at the hearing. At the beginning of the hearing, Sandstead’s attorney said Sandstead "put . . . non estate money into that [Citizens Bank] estate account." (Emphasis added.) Counsel asked hypothetically, "Can one create an estate asset that did not exist on date of death?" (emphasis added), and then said, "I don’t have an answer." The court said, "Sounds like a loan, a loan to the estate." Sandstead’s counsel then agreed that was a legitimate way to look at it. The court then reiterated, "sounds to me like a loan."
[13] Indeed, as noted, Corona never alleged that the funds were estate funds; she alleged instead that Sandstead owed her fiduciary duties as to those funds, which Sandstead had breached.
[14] The brief also said that "the only remaining property of the decedent at the time of her death was her personal property consisting of the contents of her house . . . in Sterling, Colorado."
[15] The motion in limine said: "Respondent is filing this motion after reading the Trial Brief which petitioner filed on Friday, July 8, 2011. Contrary to the issues raised by Petitioner’s Motion for Surcharge and the restatement of those issues in the Trial Management Order, the Trial Brief states that Petitioner intends to materially and significantly expand the nature of the proceedings."
[16] The dissent also appears to rely on the fact that money from the accounts was spent on matters related to the estate. But the dissent cites no authority, and we are aware of none, which holds that such expenditures transform those funds, as well as funds not so spent, from non-estate property into estate property. The money was, as a matter of law, Sandstead’s to do with as she pleased (subject to any claim by Corona to one-half of the funds); her decision to spend some of that money on matters related to the estate is simply inconsequential in this context. Further, we note that much of the money was spent in relation to real propertywhich, at the time, all parties believed not to be part of the estate by virtue of deeds executed before the deaths of Willard and Auriel. 
[17] Arguably we need not decide this issue in light of our conclusion that the farm sale proceeds were never estate property because it appears that the surcharges for pre-appointment conduct related to expenditures of those proceeds.
[18] Of course the district court had jurisdiction to determine whether the bank account funds were estate property. See §§ 13-9-103(3), 15-10-302, C.R.S. 2015; In re Estate of Murphy, 195 P.3d 1147, 1151 (Colo. App. 2008). But because, as a matter of law, those funds did not belong to the estate, the district court had no jurisdiction to determine disputes between the sisters over them.
[19] On appeal, Corona attempts to justify the surcharges by arguing, as she did in the district court, that Sandstead owed her fiduciary duties. But the district court did not find that Sandstead had breached any fiduciary duty to Corona, and, in any event, we see no basis in the Probate Code for the court to adjudicate disputes over non-probate property unrelated to any duty owed to the estate.
[20] Sandstead did not appeal surcharges related to her administration of estate personal property while PR, so we affirm as to those surcharges.
[21] We are, however, troubled by the district court’s process. Its ruling on the motion in limine was in the nature of a dismissal of claims because it precluded evidence relating to claims of improper actions relating to the money in the Citizens Bank accounts and pre-dating Sandstead’s appointment as PR. And the court expressly reiterated at the hearing that such claims would not be considered. By nonetheless ruling against Sandstead on such claims, without any advance notice or opportunity to be heard, and based on theories Corona had never advanced, the district court arguably violated Sandstead’s rights to notice and to present evidence. See Dinosaur Park Invs., L.L.C. v. Tello, 192 P.3d 513, 518 (Colo. App. 2008). The fact the court’s ruling on a motion in limine ordinarily is preliminary did not give the court license to change its mind without consideration of the situation in which it had placed Sandstead by virtue of its earlier rulings. The dissent concludes that the court acted appropriately because Sandstead did not raise the issue until her post-trial motion and did not support that motion with an affidavit as required by C.R.C.P. 59(d). But, as discussed, Sandstead clearly raised the issue before the hearing (and during the hearing). And her motion was not a C.R.C.P. 59 motion. Such motions are those filed after "entry of judgment as provided in C.R.C.P. 58." C.R.C.P. 59(a). There was no such judgment when Sandstead filed her motion. See Bowman v. Songer, 820 P.2d 1110, 1112-13 (Colo. 1991) (a motion to reconsider filed before final judgment is not subject to C.R.C.P. 59); see also C.R.C.P. 121, § 1-15(11) (governing motions to reconsider interlocutory orders). Further, the motion clearly asserted errors of law, for which no affidavit is required. C.R.C.P. 59(d)(6).
[22] On appeal, Corona relies on Restatement (Third) of Trusts § 19 cmt. f (Am. Law Inst. 2003). But we see no place in the record where she made any argument in the district court based on that provision. Therefore, we need not consider it. Estate of Stevenson v. Hollywood Bar & Café, Inc., 832 P.2d 718, 721 n.5 (Colo. 1992); Valentine v. Mountain States Mut. Cas. Co., 252 P.3d 1182, 1188 n.4 (Colo. App. 2011). In any event, that provision contemplates that, even if a trust is revoked, the settlor could take measures "by will," for example, to re-establish a testamentary trust plan. The 2000 will expressly contemplates creation of a trust if the trust was not in effect on Auriel’s death. Corona appears to argue this was some kind of mistake, but her argument is entirely speculative.
JUDGE TAUBMAN concurs in part and dissents in part.
JUDGE TAUBMAN, concurring in part and dissenting in part.
¶76       This case illustrates what happens when a decedent tries, and fails, to avoid probate by passing her property in joint tenancy to two of her three heirs. It is an exercise in asset transfers gone awry. Because I disagree with the majority that the Citizens Bank estate account established by Vicki J. Sandstead (Sandstead), the original personal representative (PR) of the estate and one of the daughters of decedent Auriel Sandstead (Auriel), was not estate property and that the original Citizens Bank accounts did not fit within an exception to the multi-party accounts statute, I respectfully dissent in part.
¶77       As discussed below, I conclude that the district court properly exercised probate jurisdiction over the funds in the Citizens Bank estate account based on Sandstead’s repeated representations for over two years that those funds were part of Auriel’s estate. I also conclude that the multi-party account statutes do not apply here and, thus, did not divest the district court of probate jurisdiction. I would affirm the district court’s orders imposing surcharges and attorney fees against Sandstead to the extent they relate to the Citizens Bank accounts and the Citizen Bank estate account. I concur with the majority’s affirmation of the order enforcing an in terrorem clause.
¶78       I conclude the district court properly surcharged Sandstead for transactions related to the Citizens Bank estate account because it had jurisdiction as a result of Sandstead’s judicial admissions that the Citizens Bank estate account was estate property. I also conclude that the district court properly surcharged Sandstead for transactions occurring before she was appointed PR because she acted in a fiduciary capacity for her sister, Shauna Sandstead Corona (Corona), when those transactions occurred and, thus, the original Citizens Bank accounts were fiduciary accounts subject to an exception in the multi-party account statute.
I. Background
¶79       As the majority notes, Auriel took steps to simplify her affairs so that Sandstead and Corona could divide the bulk of her property equally without it passing through probate. To avoid probate of the family farm, Auriel sold the property and put the proceeds into multi-party accounts at a Wells Fargo bank in Sterling, Colorado, with Auriel, Sandstead, and Corona listed as joint owners. At the time of the sale, the farm’s title was in a living trust and its beneficiaries included Auriel, Sandstead, and Corona. In June 2007, following the sale of the farm, Sandstead transferred about $200,000 from the Wells Fargo accounts to Citizens Bank accounts in Boston in the names of Auriel and Sandstead.
¶80       Following their mother’s death in November 2007, the two sisters, upon advice of an attorney that it was unnecessary to open an estate proceeding, carried out all transactions relating to the distribution of the estate informally and by agreement. However, Corona and Sandstead began to disagree on the management and division of their mother’s property.
¶81       In early June 2009, two years after she established the Citizens Bank accounts, Sandstead opened an estate account at Citizens Bank and transferred about $180,000 from the other Citizens Bank accounts into the estate account.[1] Later that month, Sandstead opened an informal probate case in Colorado and was also appointed PR to probate Auriel’s will dated January 10, 1991. In May 2010, Sandstead filed an estate inventory, in response to Corona’s motion, and listed the Citizens Bank estate account as estate property.
¶82 Less than a year later, the relationship between Sandstead and Corona further deteriorated. In May 2010, Corona filed a petition to remove Sandstead as PR. On June 10, 2010, Sandstead resigned as PR, and she and Corona agreed to the appointment of a successor PR. In July 2010, Sandstead filed her first accounting in the estate proceeding, which included receipts from transactions related to the original Citizens Bank accounts as well as the Citizens Bank estate account, and other estate-related receipts. In August 2010, a new attorney entered his appearance on behalf of Sandstead.
¶83       In February 2011, Corona filed a motion for surcharge, attorney fees, and other relief against Sandstead for her alleged maladministration of the estate as PR. Later that month, Sandstead filed a second accounting in the estate proceeding and again included receipts from transactions related to the original Citizens Bank accounts and the Citizens Bank estate account. On February 14, 2011, in her response to Corona’s motion for an accounting, Sandstead stated, "on the date of death, the only property owned by the decedent subject to the probate laws of the state of Colorado was her personal property in her house, two cars, and three bank accounts at the Citizens Bank in Boston, Massachusetts." In April 2011, Sandstead filed an amended estate inventory, which again listed the Citizens Bank estate account as estate property.[2]
¶84       In early July 2011, Sandstead suggested in her trial brief that the funds in the original Citizens Bank accounts were not property of Auriel’s estate because the accounts were jointly owned by Auriel and Sandstead and passed to Sandstead on Auriel’s death; however, Sandstead did not mention that she had established an estate account at Citizens Bank two years earlier.
¶85       A few days later, Sandstead filed a motion in limine to prohibit Corona from introducing evidence at trial regarding the Citizens Bank accounts, which the court granted. Sandstead’s motion in limine asserted:
1. On page 1 of [Corona’s] Trial Brief, [Corona] describes a transfer of $200,000 from a bank account in Colorado that was owned jointly by [Auriel], [Sandstead], and [Corona] to accounts in Massachusetts that were owned by [Auriel] and [Sandstead] only. She states that this occurred five months prior to [Auriel’s] death on June 20, 2007.
. . . .
3. On page 5, [Corona] references a[n] August 2, 2007, transfer involving $10,000 and a November 19, 2007, transfer involving $20,000, both transfers occurring before [Auriel’s] death, making them non-estate property. Moreover, [Corona] admits that these monies came from an account over which [Sandstead] was a signatory and named owner.
. . . .
WHEREFORE, [Sandstead] requests that this Court enter an Order, in limine, before the start of the trial on July 18, 2011, prohibiting [Corona] from introducing evidence regarding the transfers of money out of bank accounts before [Auriel’s] death.
¶86       In my view, Sandstead indicated at most, that the $30,000 of the funds in the Citizens Bank account described above were not part of the estate.
¶87       Despite granting the motion in limine, the court allowed Corona’s attorney at the July 2011 trial to question Sandstead about transactions and money transfers occurring before Auriel’s death. Sandstead testified that she was using funds from the Citizens Bank accounts and estate account, after Auriel’s death and and both before and after her appointment as PR, for estate purposes. Because Sandstead failed to mention that she was Auriel’s attorney-in-fact prior to the establishment of the accounts in question, the court determined that the factual underpinnings of its order granting the motion in limine were incomplete.
¶88       In its first written post-hearing order on the motion for surcharge, the court found, notwithstanding its prior rulings, that Sandstead was a fiduciary as to the money in the Citizens Bank accounts because Sandstead had acted under an agency created by the March 2007 durable power of attorney in transferring the money from Wells Fargo to Citizens Bank, and had established an implied or constructive trust, the assets of which were later administered in the estate under Sandstead’s authority as PR.
¶89       In February 2012, Sandstead argued in her motion for reconsideration or for a new trial that the Citizens Bank estate account was not estate property.
¶90       In five detailed orders, the court surcharged Sandstead for improper use of estate property including: expenses to which Corona objected and which Sandstead paid out of the estate funds anyway; Sandstead’s unsubstantiated payments to herself; missing funds or unexplained discrepancies and transfers; waste and unreasonable moving and storage costs; an appraisal for a quilt Sandstead improperly donated; and attorney fees and costs. For example, the court surcharged Sandstead $2414.57 for expenses related to Sandstead’s travels to a condominium owned by both sisters in Florida. The court found that "[n]o benefit to the Estate or Trust ha[d] been shown . . . and [the expenses] post-date Ms. Corona’s objection to further work on the condo." The court also surcharged Sandstead $10,250 for donating nineteen valuable, heirloom quilts. The court found that Sandstead as PR "lacked the power to make gifts of valuable trust assets" and, in fact, was obligated to distribute any tangible assets in the trust corpus pursuant to a memorandum prepared by Auriel, which Sandstead never produced.
¶91       In these five orders, the court surcharged Sandstead over $100,000 for improper spending of funds in the Citizens Bank accounts both before and after Auriel’s death. The court ordered one surcharge of $25,000 for actions Sandstead took before Auriel’s death. The court imposed eight surcharges against Sandstead for actions she took after Auriel’s death, but before her appointment as PR, in the amount of $36,716.15. The court imposed an additional eleven surcharges against Sandstead for actions she took while she was PR in the amount of $16,325.15. The court imposed four more surcharges against Sandstead for actions she took after she was removed as PR in the amount of $50,821.27.
¶92       In March 2013, the court admitted Auriel’s will dated July 25, 2000, to probate in formal proceedings. The court also vacated its previous order for informal probate of Auriel’s will dated January 10, 1991. The court, in a detailed analysis, agreed with Sandstead that Willard (Auriel’s late husband) and Auriel had not effectively revoked the living trust, but found the proceeds from the farm sale had been handled as "estate assets" and were therefore subject to the court’s jurisdiction. The court also found that Auriel’s 2000 will was valid.
II. Subject Matter Jurisdiction
¶93       I perceive no error in the district court’s conclusion that it had jurisdiction over the Citizens Bank accounts and jurisdiction over Sandstead’s expenditures of funds from those accounts before she was appointed PR.
A. Standard of Review
¶94       We review de novo a court’s determination of jurisdiction. First Horizon Merch. Servs., Inc. v. Wellspring Capital Mgmt., LLC, 166 P.3d 166, 172 (Colo. App. 2007).
B. Applicable Law
¶95       A district court sitting in a probate matter has the same jurisdiction as the Denver Probate Court. In re Estate of Lembech, 622 P.2d 606 (Colo. App. 1980). Probate courts have broad jurisdiction, including jurisdiction over property claimed by the estate which may ultimately not belong to the estate. See In re Estate of Murphy, 195 P.3d 1147, 1151 (Colo. App. 2008). Since a district court sitting in probate has the same jurisdiction as the Denver Probate Court, the district court here had jurisdiction "to determine every legal and equitable question arising in connection with decedents’ . . . estates, so far as the question concerns any person who is before the court by reason of any asserted right in any of the property of the estate . . . ." Id. at 1150 (quoting § 13-9-103(3)(a), C.R.S. 2015).
¶96       Section 15-10-302(1), C.R.S. 2015, gives probate courts
jurisdiction over all subject matter vested by "articles 1 to 10 of title 13" of the Colorado Revised Statutes, which includes article 9 of title 13 concerning the jurisdiction of the Denver Probate Court. Under section 15-10-302(2), a probate court has "full power to make orders, judgments, and decrees and take all other action necessary and proper to administer justice in the matters which come before it." Article 9 of title 13 specifically provides probate courts with jurisdiction "to determine every legal and equitable question arising . . . so far as the question concerns any person who is before the court by reason of any asserted right in any of the property of the estate or by reason of any asserted obligation to the estate." § 13-9-103(3) (emphasis added).
¶97       Here, Corona filed her motion for surcharges under section 15-10-504(2)(a), C.R.S. 2015, which provides that "[i]f a court, after a hearing, determines that a breach of fiduciary duty has occurred, or an exercise of power by a fiduciary has been improper, the court may surcharge the fiduciary[.]" While part 5 of article 10, title 15, does not specifically define "fiduciary," the provisions apply broadly to a variety of fiduciaries "over whom a court has obtained jurisdiction, including but not limited to a personal representative, special administrator, guardian, conservator, special conservator, trustee, agent under a power of attorney, and custodian . . . ." § 15-10-501(3), C.R.S. 2015.
¶98       Under section 15-10-501(2)(c), jurisdiction extends to
"personal jurisdiction obtained by a court over a fiduciary as a result of the filing of a proceeding concerning the estate." The "estate," in turn, "means the estate of a decedent; a guardianship; a protective proceeding; a trust, including an implied trust; [or] an agency created by a power of attorney[.]" § 15-10-501(2)(b). Section 15-10-501(1) provides for probate jurisdiction over the fiduciaries of "nonsupervised trusts, private trusts, [and] agencies created by powers of attorney, . . . except as provided in paragraph (c) of subsection (2) of this section[.]"
C. Analysis
¶99       I conclude that the district court had jurisdiction over the Citizens Bank estate account because the account became estate property when Sandstead repeatedly asserted (between June 2009 and July 2011) that the funds were estate property.[3] Estate of Murphy supports the conclusion that the district court had jurisdiction because the parties asserted competing interests over property that had initially been held with the decedent in joint tenancy in the Wells Fargo accounts. 195 P.3d at 1151. Therefore, the district court, sitting as a probate court, had jurisdiction to address both legal and equitable issues concerning the funds in the Citizens Bank estate account, including whether the proceeds from the farm sale were Sandstead’s individual property or property of the estate.
¶100       The district court also correctly concluded it had jurisdiction to address allegations of misfeasance by Sandstead for the period leading up to, and during, her administration of the estate, because Sandstead acted under a fiduciary relationship created by the durable power of attorney and an implied trust.[4]
¶101       The district court concluded subsections (1) and (2)(c) of section 15-10-501 appear to be inconsistent because it seemed contradictory that a court could exercise personal jurisdiction under subsection 2(c) over a fiduciary as a result of a proceeding concerning an "estate" when jurisdiction over fiduciaries of certain trust and agencies created by powers of attorney appear to be denied under subsection (1).
¶102       Unlike the district court, I do not conclude that subsections (1) and (2)(c) of section 15-10-501 appear to be inconsistent. However, the court’s observations explain how the two subsections relate to one another. Non-supervised trusts, private trusts, and power of attorney agencies generally need not be subject to court jurisdiction, while decedents’ estates, guardianships, and conservatorships will generally be subject to judicial supervision. On the other hand, a court’s jurisdiction over trusts, or power of attorney agencies and other entities, is not exercised until some action is needed to address the acts of a fiduciary, or for other reasons, such as to appoint a trustee. Once a proceeding has been initiated under subsection (2)(c), and personal jurisdiction is obtained over the fiduciary of an estate, the exception to the jurisdictional limitations described in subsection (1) applies, and the court may then "employ all of the powers and authority expressed in the provisions of this part [5] to maintain the degree of supervision necessary to ensure the timely and proper administration of estates by [the fiduciary in question.]" § 15-10-501(1).
¶103       As to trusts, specifically, the court has jurisdiction to oversee (1) trustees’ compensation, section 15-16-205, C.R.S. 2015; (2) whether their acts as trustee are in accord with their general obligations under section 15-16-302, C.R.S. 2015; and (3) their duty to account, section 15-16-303, C.R.S. 2015. See Restatement (Third) of Trusts §§ 82, 83 (Am. Law Inst. 2007).
III. Judicial Admissions
¶104       I perceive no error in the district court’s conclusion that Sandstead’s repeated assertions over two years that the funds in the Citizens Bank estate account were part of Auriel’s estate constituted judicial admissions that the Citizens Bank estate account was estate property.5
A. Standard of Review
¶105       We review de novo the legal conclusions of a district court. E-470 Pub. Highway Auth. v. 455 Co., 3 P.3d 18, 22-23 (Colo. 2000).
B. Applicable Law
¶106       A judicial admission is:
a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute. Judicial admissions are conclusive on the party making them and generally continue to have effect for a subsequent part of the same proceeding.
People v. Garcia, 826 P.2d 1259, 1263 (Colo. 1992). The Garcia court, quoting the New Hampshire Supreme Court, stated that "[w]hether [a litigant’s] statements be true or false, he will be bound by them, and possible contradictions by other witnesses become immaterial. He will not be allowed to obtain a judgment based on a finding that he has perjured himself." Id. (citation omitted); see also Davis v. Wakelee, 156 U.S. 680, 689 (1895) (holding that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position"); but cf. Stelco Holding Co. v. United States, 44 Fed. Cl. 703, 711 (1999) ("[I]t is clear that prior to entry of final judgment, the court has a duty to reject a judicial admission that is demonstrably false.").
C. Analysis
¶107       In my view, Sandstead’s representations to the court over two years that she had established an estate account, the estate inventories and accountings, her trial briefs, and her trial testimony constituted judicial admissions that the funds in the Citizens Bank estate account were estate property.
¶108       First, in June 2009, Sandstead transferred the funds from the original Citizens Bank accounts into the estate account at Citizens Bank. Sandstead, in both her initial and amended estate inventories (May 2010 and April 2011) listed the Citizens Bank estate account as estate property, with no indication that she claimed it as individual property.[6] She also listed expenditures from the Citizens Bank estate account allegedly on behalf of the estate in both of her accountings in July 2010 and July 2011.
¶109       In July 2011, for the first time after two years of litigation, Sandstead changed her position, claiming that the $30,000 of funds in the Citizens Bank estate account transferred before Auriel’s death were non-estate property. The record reveals no indication during the two previous years of litigation that Sandstead had previously made this assertion.
¶110        This declaration did not overcome Sandstead’s repeated assertions in the district court that the funds in the Citizens Bank accounts were estate property, particularly when juxtaposed against Sandstead’s own testimony at trial that she had used the Citizens Bank estate account for estate-related expenses. See Garcia, 826 P.2d at 1263. At the July 2011 trial, one week after Sandstead filed her motion in limine, she testified that she used money from the Citizens Bank estate account to pay for the estate attorney, furniture movers, auctioneers, and her own professional services to inventory the property in her mother’s home. She also paid the auto insurance for her parents’ cars and the electric bill for Auriel’s home from the account. Thus, on the date Sandstead created the estate account at the Citizens Bank, funds in that account were subject to the probate laws of the state of Colorado.
¶111       Further, it was not until February 2012, after two years and eight months of litigation, that Sandstead unequivocally changed her position. Sandstead contended that after she put the funds in the estate account, she "claimed an undivided half interest in th[e] funds." However, the record reveals no indication during the almost three years of litigation that Sandstead had previously made this assertion. Again, this declaration, which only occurred after the district court had relied on her affirmative act of opening the estate account and subsequent failure to claim the account as her individual property to rule that the Citizens Bank estate account was estate property, cannot overcome Sandstead’s repeated assertions in the district court that the funds in the Citizens Bank accounts were estate property. See id.
 
¶112       Sandstead argued to the district court and again on appeal that opening the estate account and placing the remaining funds from the original Citizens Bank accounts was not a judicial admission. She urges that her statements on previously filed inventories were not binding upon her because they were merely "inconsistent legal positions or inconsistent legal theories." The district court rejected these arguments.
¶113       The district court found that there was no indication in the inventories that Sandstead claimed the listed assets individually rather than as an heir and thus distinguished the case from such cases as Gordon v. Benson, 925 P.2d 775, 781 (Colo. 1996), where counsel for one of the parties uttered remarks in recognition of the various theories that might be supported by evidence in that case, while arguing on behalf of one of those theories. The district court also concluded that it is settled law that statements made by a personal representative in an inventory can be the basis of a judgment. Cf. In re Grigsby’s Estate, 98 Colo. 489, 494, 56 P.2d 1318, 1320-21 (1936) (where personal representative listed on an inventory promissory notes payable by him to decedent, he admitted valid and enforceable claim against himself). The district court found that, even if not conclusive, the fact that an asset is listed on an estate inventory is at least prima facie evidence of its title. In re Randall’s Estate, 40 N.W.2d 446, 449 (N.D. 1946); see also Giacomini v. Giacomini, 81 N.W.2d 194, 199 (Neb. 1957) (a personal representative taking property in her fiduciary capacity is generally estopped to deny title in her decedent). Together with the other evidence in the case, the district court concluded that the inclusion of the Citizens Bank estate account on the inventories of Auriel’s estate at least would tend to favor a finding that the assets were estate assets.
¶114       I agree with the district court. Thus, I believe Sandstead’s actions and statements that the Citizens Bank estate account was estate property were judicial admissions, even if Auriel had not intended that the funds in those accounts be part of her estate.
IV. Pre-appointment Surcharges
¶115       I also perceive no error in the district court’s conclusion that it could surcharge Sandstead for her expenditure of funds in the Citizens Bank accounts before she was appointed PR.
A. Standard of Review
¶116       We review de novo legal conclusions of a district court. E-470 Pub. Highway Auth., 3 P.3d at 22-23. To the extent that Sandstead challenges the district court’s conclusion that she did not create an implied trust by transferring money from Wells Fargo to Citizens Bank, that finding is a mixed question of law and fact. Where there is a mixed question of law and fact, we give deference to the district court’s factual findings, absent an abuse of discretion, but review de novo the questions of law. Sheridan Redevelopment Agency v. Knightsbridge Land Co., L.L.C., 166 P.3d 259, 262 (Colo. App. 2007).
B. Applicable Law
¶117       Article 15 of the Probate Code explains what transpires on the death of an owner of a multi-party account. Section 15-15-212, C.R.S. 2015, provides that "on death of a party sums on deposit in a multiple-party account belong to the surviving party or parties." However, such non-probate transfers are subject to probate statutes when there is "a fiduciary or trust account in which the relationship is established other than by the terms of the account." § 15-15-202, C.R.S. 2015.
C. Analysis
¶118       The majority states that because the Citizens Bank accounts were joint bank accounts and do not fit within a statutory exception, they are non-probate property. I disagree.
¶119       The majority states that upon Auriel’s death, the money in the Wells Fargo account belonged to Sandstead and Corona in equal shares and, therefore, the Wells Fargo money was not property of Auriel’s estate. I agree. From the record, it is unclear whether any of the surcharges imposed by the district court related to the Wells Fargo account. In my view, as discussed above, the surcharges from the Citizens Bank accounts were proper. However, I would remand for the district court to specify whether any surcharges were from the Wells Fargo account. To the extent the district court surcharges concerned transactions related to the Wells Fargo account, I would reverse, because under the multi-party account statutes, those funds were jointly held by Sandstead and Corona on Auriel’s death.
¶120       However, I conclude the district court did not err in applying section 15-15-202 to the Citizen Bank accounts. Beginning on March 6, 2007, Sandstead became an attorney-in-fact for Auriel. The power of attorney was durable; thus, from that point forward, Sandstead was a fiduciary to her mother. See Moffett v. Life Care Ctrs. of Am., 187 P.3d 1140, 1144 (Colo. App. 2008), aff’d, 219 P.3d 1068 (Colo. 2009) (noting that the execution of a power of attorney creates a principal-agent relationship); see also In re Trust of Franzen, 955 P.2d 1018, 1021 (Colo. 1998) ("A power of attorney is an instrument by which a principal confers express authority on an agent to perform certain acts or kinds of acts on the principal’s behalf.").
¶121       The majority concludes there was no evidence that the Citizens Bank accounts were created or used as fiduciary or trust accounts. However, as the district court properly concluded, the evidence at trial established that Sandstead was acting at her mother’s behest in terms of financial management, and, likewise, failed to support a conclusion that the transfers in question were some type of gift to Sandstead. See § 15-14-606, C.R.S. 2015 (duty of agent to act in best interests of principal); Franzen, 955 P.2d at 1021-22 (generally discussing authority of agent under power of attorney); People v. Madison, 176 P.3d 793 (Colo. App. 2007) (son accepting responsibilities under power of attorney had duty to act in father’s best interests).
¶122       The district court found that the evidence was clear and convincing that Sandstead did not "own" the money given to her in joint tenancy, but, rather, was an agent of her mother and her sister, and responsible for her mother’s well-being as related to the management of those funds. McClellan v. Morris, 71 Colo. 304, 312, 206 P. 575, 579 (1922) (finding that the power of an agent is to be exercised for the principal’s benefit, rather than for the private advantage of the agent). As a result, section 15-15-202 applied to the funds transferred to the Citizens Bank accounts because they were actually established as a type of agency or trust accounts.[7] 
V. Attorney Fees and Costs
¶123       The district court awarded attorney fees and costs to Corona under section 15-10-504(2)(a). Because I conclude that the Citizens Bank accounts were estate property and that Sandstead owed a fiduciary duty to Corona, I would affirm most of the order awarding attorney fees and costs relating to the Citizens Bank accounts. To the extent any fees and costs relate to the Wells Fargo accounts, it is in the district court’s discretion to consider whether to reduce the fees. See Oten v. Colo. Bd. of Soc. Servs., 738 P.2d 37, 42 (Colo. App. 1987) ("No reduction is required unless the unsuccessful claim represents a ‘substantial separate issue.’" (quoting Duran v. Lamm, 644 P.2d 66, 68 (Colo. App. 1981))).
VI. Conclusion
¶124       I would affirm the district court’s orders regarding surcharges and attorney fees to the extent they relate to the original Citizens Bank accounts and the Citizens Bank estate account. I would reverse the district court’s orders only to the extent the district court determines on remand that any of the surcharges related to funds in the Wells Fargo accounts. Otherwise, I concur with the majority’s affirmation of the order enforcing the in terrorem clause.

[1] Sandstead asserted this in her motion for reconsideration or a new trial filed in February 2012.
[2] In March 2011, Sandstead filed a response to Corona’s motion for surcharge, attorney fees, and other relief. The majority reads Sandstead’s response as notifying Corona and the court that Sandstead considered any dispute relating to spending farm sale proceeds to be off limits. Sandstead wrote: "Monies held in joint bank accounts due to the decedent putting that money into a joint bank account before her death deprives the probate court of jurisdiction to administer those funds or to adjudicate how those funds were spent." Sandstead was correct that Auriel placing money in the Citizens Bank accounts did not make that money estate property. The majority does not recognize the distinction I make between the Citizens Bank accounts and the Citizen Bank estate accounts. The Citizens Bank estate accounts were estate property because of Sandstead’s judicial admissions. I do not state that the Citizens Bank accounts prior to being converted into estate accounts were estate property. Therefore, Sandstead’s focus on the accounts at the time that Auriel was alive does not change my position.
[3] Part III, infra, will analyze the issue of the judicial admissions.
[4] See infra Part IV for an analysis of the fiduciary relationship.
[5] The majority cites part of a discussion between the district court and Sandstead’s counsel at the beginning of the motion in limine hearing. After the conversation cited by the majority, the court stated that the treatment of the Citizens Bank funds as estate property might "sound like a loan, a loan to the estate." Sandstead’s counsel replied, "That’s one way I thought it could be analyzed. It could be a loan to the estate, and I guess it could be pigeonholed or boxed in a number of ways; a loan is one way, I agree." The court responded, "Maybe not the only way, but sounds to me like a loan." I do not consider the court ruminating that the money could be a loan as a ruling on whether such funds were not estate property so as to preclude it from taking a contrary position later.
[6] To the extent the majority characterizes the filing of the estate inventory as related to probate, rather than litigation, I disagree. Sandstead filed her estate inventory only after Corona petitioned for Sandstead’s removal as PR, appointment of a successor PR, a proper accounting and inventory, as well as supervised administration of the estate. Therefore, unlike In re Estate of Hill, 931 P.2d 1320, 1325 (Mont. 1997), the estate inventory here was made in the context of litigation.
[7] The majority suggests that the district court violated Sandstead’s rights to notice and to present evidence when it granted Sandstead’s motion in limine and then later reversed its ruling. Although Sandstead’s motion did not specifically refer to C.R.C.P. 59(d), the district court noted Sandstead’s arguments most closely related to C.R.C.P. 59(d)(1), irregularities preventing a party from a fair trial. A C.R.C.P. 59(d)(1) motion must be supported by an affidavit. See In re Petition of Taylor, 134 P.3d 579, 583 (Colo. App. 2006). The district court noted that Sandstead’s motion did not comply with the requirements of C.R.C.P. 59(d). I agree. No affidavit was attached to Sandstead’s motion. Further, as the district court noted, Sandstead did not specify what she would have done had she received "adequate notice of the claims asserting a breach of fiduciary duty over bank funds." See Kelley v. Colo. Mobile Home Licensing Bd., 662 P.2d 199, 200 (Colo. App. 1983) (conclusory allegations are insufficient under the rule).